**SIERRA CLUB and Friends of the West Shore, Plaintiffs,**

v.

**TAHOE REGIONAL PLANNING AGENCY, County of Placer, and Board of Supervisors of the County of Placer, Defendants.**

**Homewood Village Resorts, LLC, and JMA Ventures, LLC, Defendants and Real Parties in Interest.**

**No. CIV. 2:12–0044 WBS CKD.**

United States District Court, E.D. California.

Jan. 4, 2013.

Memorandum Denying Motion to Amend Feb. 27, 2013.

Paul Robert Cort, Trent William Orr, Wendy Sangbee Park, Earthjustice, San Francisco, CA, Michael R. Lozeau, Lozeau Drury LLP, Oakland, CA, for Plaintiffs.

Andrew B. Sabey, Cox, Castle & Nicholson LLP, San Francisco, CA, Karin E. Schwab, Auburn, CA, for Defendants.

Howard F. Wilkins, III, Whitman F. Manley, Remy Moose Manley, Sacramento, CA, for Defendants and Real Parties in Interest.

## MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT

WILLIAM B. SHUBB, District Judge.

Plaintiffs Sierra Club and Friends of the West Shore ("FOWS") brought this action against defendants the County of Placer, the Board of Supervisors of the County of Placer ("County"), the Tahoe Regional Planning Agency ("TRPA"), Homewood Village Resorts, LLC, and JMA Ventures, LLC (collectively, "defendants"), alleging violations of the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code § 21000–21176 and the Tahoe Regional Planning Compact ("Compact"), Pub. L. No. 96–551, 94 Stat. 3233 (1980); Cal. Gov't Code § 66801 et seq.; Nev.Rev. Stat. § 277.200 et seq. Plaintiffs' allegations pertain to TRPA and the County's approval of the Homewood Ski Area Master Plan (the "Project"), which allows for the expansion of the Homewood Mountain Resort in Homewood, California. Presently before the court are plaintiffs' motion for summary judgment and defendants' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## I. Introduction and Facts

### A. Compact and TRPA's Regulation

The Lake Tahoe Region ("Region") is located on the California–Nevada border and comprises about 501 square miles, including the waters of Lake Tahoe, which cover 191 square miles.[1] (RP at i.) The primary focus of environmental regulation

---

1. The Regional Plan, (Administrative Record ("AR") 13760–696), is cited as "RP at [internal page number]."

in the Region is to protect the exceptional water clarity of the lake. *Id.* Homewood is a town on the lake's west shore and lies within Placer County, California.

In 1968, California and Nevada entered into the Compact, which was approved by Congress in 1969. *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency,* 739 F.Supp.2d 1260, 1265 (E.D.Cal.2010) (*"League"*) (Karlton, J.), *aff'd in part, vacated in part, remanded,* 469 Fed.Appx. 621 (9th Cir.2012). The Compact guides all planning and development in the Region and was amended in 1980 to direct TRPA, the agency it created, "to establish environmental threshold carrying capacities" for the Region. (Compl. Ex. A ("Compact") art. I(b) (Docket No. 1).) The "environmental threshold carrying capacities" are environmental standards "necessary to maintain a significant scenic, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region" and "shall include but not be limited to standards for air quality, water quality, soil conservation, vegetation preservation and noise." (*Id.* art. II(i).) TRPA has adopted thirty-six threshold standards, including standards for water quality, air quality, noise, and scenic quality. (*See* Administrative Record ("AR") 12879 (TRPA Resolution adopting thresholds).)

The Compact also required TRPA "to adopt and enforce a regional plan and implementing ordinances which will achieve and maintain [the thresholds] while providing opportunities for orderly growth and development consistent with such capacities." (Compact art. I(b).) In 1987, TRPA adopted the Regional Plan, which describes the needs and goals of the Region and provides policies to guide action affecting the Region's resources. (RP at iii.) The Regional Plan is implemented by the Code of Ordinances and the Rules of Procedure promulgated by TRPA. *See Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency,* 311 F.Supp.2d 972, 979–80 (D.Nev.2004).

TRPA also has regulatory authority over specific projects. For each project that may have a significant effect on the environment, TRPA must adopt findings that the project will not interfere with implementation of the Regional Plan or cause the thresholds to be exceeded. (Compact art. V(g).) TRPA must also prepare an environmental impact statement ("EIS") for the project, similar to that required by CEQA, identifying the project's significant environmental impacts, the impacts that cannot be avoided if the project is implemented, alternatives to the project, and mitigation measures that must be implemented to assure meeting the standards of the region, among other things. (*Id.* art. VII(a)(2)(A)-(D).)

Changes to TRPA's implementing documents require particular findings. When TRPA amends the Regional Plan, it must find "that the Regional Plan, as amended, achieves and maintains the thresholds." [2] (Park Decl. Ex. 1 ("Code") § 6.4 (Docket No. 40).) Likewise, when it amends the Code, it must find that "the Regional Plan, and all of its elements, as implemented through the Code, Rules, and other TRPA plans and programs, as amended, achieves and maintains the thresholds." *Id.* § 6.5.

### B. *Homewood Project*

Homewood was developed in about 1900 as a vacation resort. (AR 3105.) It is mainly a residential town, with only 906 residents in 2004. (*Id.* at 3005, 3119.) The Homewood Mountain Resort ("Resort" or "HMR") opened in 1962 and is the largest tourism feature in the town. (*Id.* at 3119, 12733.) It has four main chairlifts and two distinct lodge areas, the South Base and North Base. (*Id.* at 7351.) It is

---

**2.** The court cites to the Code in effect at the time of the Project approvals.

primarily a "day ski" area because it has no overnight accommodations. (*Id.* at 40478.)

In 2006 and 2007, the owners of the resort, JMA Ventures and Homewood Village Resorts LLC (collectively, "JMA"), proposed the Project, a planned expansion of the Resort from 25,000 square feet to over one million square feet that would add 325 new residential and tourist accommodation units to the surrounding Homewood community. (*Id.* at 2691–92, 3481.) The Project is intended to update the Resort's ski facilities and bring new development rights, including commercial floor area, residential units, and tourist accommodation units, to the Project area, which currently has no residential or tourist accommodation units. (*Id.* at 3119.) The Resort is currently operating at a loss, and the Project is also designed to generate enough revenue to fund the environmental benefits the Project will bring and ensure its continued economic viability. (*Id.* at 2749, 18968.)

In February 2008, TRPA's Governing Board accepted the Project into the "Community Enhancement Program" ("CEP"), which was created to provide incentives to developers to create "mixed-use, transit-orientated development" in the Region. (*Id.* at 7351.) It grants projects development rights—bonus commercial floor area allocations and bonus tourist accommodation units ("TAUs")—from a pool reserved for projects that provide a "substantial environmental benefit" or "mitigation in excess" of legal requirements.[3] *See* Code §§ 33.3.D(3)(C)(ii), 33.4.A(3). For the Project to participate in this program, TRPA adopted a resolution listing the minimum requirements it must meet. (AR 2680.) The benefits the Project will provide include water quality improvements, retirement of sensitive lands, and an overall reduction in land coverage. (*Id.* at 3920; *see also* AR 2977–79 (noting other Project benefits).)

To meet the environmental review requirements of both CEQA and the Compact, the County and TRPA jointly issued the draft environmental impact report-environmental impact statement ("EIR–EIS") in January 2011. (*Id.* at 239.) The draft studied the proposed Project and five alternatives, including a "reduced project alternative," which proposed a fifteen percent reduction in development for a total of 297 residential and tourist accommodation units. (*Id.* at 268–70.) The proposed project required several land-use planning amendments to the Regional Plan, Code, and Plan Area Statements ("PASs").[4] These amendments are considered part of the proposed project and were analyzed during the Project's environmental review. (*See id.* at 3926.) They include amendments to the Regional Plan and to the Code to remove the requirement that additional TAUs in a ski area be allocated only under an adopted community plan, (*id.* at 36–61); amendments to several PASs for the Resort to expand its urban boundary, (*id.* at 358, 540–41); and additional Code amendments to allow additional height and groundwater interception for below-grade parking in the proposed project's areas, (*id.* at 360–61).[5]

In October 2011, TRPA and the County issued the final EIR–EIS. (*Id.* at 2675–

---

**3.** "Additional" TAUs are any TAUs created after 1987; they require an allocation from TRPA. Code § 33.4.A. For projects meeting certain criteria, "bonus" TAUs are awarded by TRPA when at least one existing TAU is transferred for each TAU bonus unit received. *Id.* § 35.3.

**4.** Note that the Project entailed a new ski area master plan, which is itself an amendment to the Regional Plan.

**5.** The Regional Plan consists of the "Goals and Policies" document and the Code. For ease, amendments to the "Goals and Policies" are referred to as amendments to the Region-

7333.) It modified the proposed project, "Alternative 1A," to meet concerns raised during the comment period. (*Id.* at 2756.) The same amendments remained necessary. (*Id.* at 2788–89.) The EIR–EIS found that neither the reduced alternative (Alternative 6), nor any smaller project, would produce enough revenue to support the Project's proposed environmental improvements and ensure the continued viability of the ski operations. (*Id.* at 326.) Later in October, the County approved the Project and the EIR–EIS. (*Id.* at 9236, 9245.) Plaintiffs appealed both. (*Id.* at 8311.) The County denied the appeal and certified the EIR–EIS. (*Id.* at 41–42.) On December 14, 2011, TRPA held a hearing on the Project. (TRPA Administrative Record ("TAR") at 205–07.) It certified the EIR–EIS, approved the amendments, and approved the Project. (*Id.* at 1017–21.)

## II. *Legal Standard*

Although the parties bring cross-motions for summary judgment, this is a record-review case and there are no material facts in dispute.[6] The ordinary standards for summary judgment are therefore not implicated. *League,* 739 F.Supp.2d at 1267. Instead, the court must determine whether either party is entitled to judgment as a matter of law. *Id.*

### A. *CEQA*

■ CEQA is "a comprehensive scheme designed to provide long-term protection to the environment." *Napa Citizens for Honest Gov't v. Napa Cnty. Bd. of Supervisors,* 91 Cal.App.4th 342, 355, 110 Cal. Rptr.2d 579 (2001). Its provisions are fleshed out by the "Guidelines" set forth in the California Code of Regulations, title 14, section 15000 *et seq.* ("Guidelines").[7]

al Plan and amendments to the Code are referred to as such.

6. Defendants request that the court take judicial notice of the final 2011 Threshold Evaluation Report. (Defs.' Req. for Judicial Notice Ex. A (Docket No. 58).) Plaintiffs object to this request. (Pls.' Obj. to Req. for Judicial Notice (Docket No. 63).) Defendants suggest that the court consider this exhibit as indicating the truth or falsity of agency predictions. The court declines to adopt this rationale for considering this exhibit. *See League,* 739 F.Supp.2d at 1264 n. 1. Defendants also request that the court take judicial notice of ozone monitoring reports from the U.S. Environmental Protection Agency.

(Defs.' Req. for Judicial Notice Ex. B (Docket No. 47–2).) The court declines to consider this report for the same reason. Relatedly, defendants request judicial notice of TRPA Resolution 2012–17 and Findings, which issued the final 2011 Threshold Evaluation Report. (Defs.' Req. for Judicial Notice Ex. A (Docket No. 66).) Because the court does not rely on the 2011 Threshold Evaluation Report, it need not decide whether to consider this document, which is offered for the purpose of urging the court to take judi-

cial notice of the 2011 Threshold Evaluation Report.

Defendants also request judicial notice of a state court decision, *California Clean Energy Committee v. County of Placer,* (Defs.' Req. for Judicial Notice Ex. 1 (Docket No. 59)), and a TRPA staff report, September 2007 Staff Report to TRPA Governing Board re: Amendment of Chapter 82, Water Quality Mitigation and Amendment of Chapter 93, Traffic and Air Quality Mitigation Program, to Raise the Mitigation Fees to Reflect Increased Cost of Construction, (*id.* Ex. 2). Plaintiffs object to both requests. (Pls.' Obj. to Req. for Judicial Notice.) The court finds that judicial notice of the decision is proper only for the fact of its existence. *Cal. ex rel. RoNo, LLC v. Altus Fin. S.A.,* 344 F.3d 920, 931 (9th Cir.2003). The court does not consider the TRPA report to reach its conclusions and therefore need not determine whether it is properly subject to judicial notice.

7. The California Supreme Court recently reaffirmed: "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova,* 40 Cal.4th

CEQA is to be interpreted in a manner that gives the fullest possible protection to the environment within the scope of the statutory language. *Citizens of Goleta Valley v. Bd. of Supervisors*, 52 Cal.3d 553, 563, 276 Cal.Rptr. 410, 801 P.2d 1161 (1990) (*"Goleta I"*). The environmental impact report ("EIR") is described as the "heart of CEQA;" its purpose is to inform the public and government officials of the environmental consequences of decisions before they are made. *Laurel Heights Improvement Ass'n v. Regents of Univ. of Cal.*, 47 Cal.3d 376, 392, 253 Cal.Rptr. 426, 764 P.2d 278 (1988) (*"Laurel Heights"*). It requires project proponents to "identify ways that environmental damage can be avoided or significantly reduced" and assists to "[p]revent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible." Guidelines § 15002(a)(2)-(3).

■ Under CEQA, the court's review is generally limited to ascertaining whether the public agency abused its discretion by not proceeding as required by law or by making a determination that is not supported by substantial evidence. Cal. Pub. Res. Code §§ 21168, 21168.5; *Californians for Alternatives to Toxics v. Dep't of Food & Agric.*, 136 Cal.App.4th 1, 12, 38 Cal. Rptr.3d 638 (1st Dist.2005) (*"CATS"*). Judicial review of these two kinds of error is very different. *Cal. Native Plant Soc. v. City of Santa Cruz*, 177 Cal.App.4th 957, 984, 99 Cal.Rptr.3d 572 (6th Dist.2009). Thus, "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*, 40 Cal.4th 412, 412, 428 n. 5, 53 Cal.Rptr.3d 821, 150 P.3d

435, 53 Cal.Rptr.3d 821, 150 P.3d 709 (2007) (*"Vineyard Area Citizens"*).

■ An agency fails to proceed in a manner required by law when it fails to comply with the informational requirements of CEQA. *CATS*, 136 Cal.App.4th at 12, 38 Cal.Rptr.3d 638. The court determines *de novo* whether the agency used the correct procedures in taking the challenged action. *Cal. Native Plant Soc.*, 177 Cal.App.4th at 984, 99 Cal.Rptr.3d 572. "Substantial evidence" is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." Guidelines § 15384(a). Under this standard, the court "accord[s] greater deference to the agency's substantive factual conclusions." *Vineyard Area Citizens*, 40 Cal.4th at 435, 53 Cal.Rptr.3d 821, 150 P.3d 709. It "'resolve[s] reasonable doubts in favor of the administrative finding and decision.'" *Laurel Heights*, 47 Cal.3d at 393, 253 Cal.Rptr. 426, 764 P.2d 278 (quoting *Topanga Ass'n for a Scenic Cmty. v. Cnty. of Los Angeles*, 11 Cal.3d 506, 514, 113 Cal.Rptr. 836, 522 P.2d 12 (1974)). It is not for the court to determine the correctness of the EIR's environmental conclusions, but rather only its sufficiency as an informative document. *Laurel Heights*, 47 Cal.3d at 392, 253 Cal. Rptr. 426, 764 P.2d 278. Thus, the court cannot overturn an agency's approval of an EIR because an opposite conclusion would have been equally or even more reasonable. *CATS*, 136 Cal.App.4th at 12, 38 Cal.Rptr.3d 638.

■ "An EIR will be found legally inadequate—and subject to independent review for procedural error—where it omits information that is both required by CEQA and necessary to informed discussion." *Cal. Native Plant Soc.*, 177 Cal.App.4th at 986, 709 (2007).

99 Cal.Rptr.3d 572. In contrast, the usual dispute will "concern the amount or type of information contained in the EIR, the scope of the analysis, or the choice of methodology." *Id.* This is a factual determination that receives substantial evidence review. *San Joaquin Raptor Rescue Ctr. v. Cnty. of Merced,* 149 Cal.App.4th 645, 654, 57 Cal.Rptr.3d 663 (5th Dist.2007).

■ CEQA's exhaustion requirement is characterized by California courts as jurisdictional. *Cal. Native Plant Soc. v. City of Rancho Cordova,* 172 Cal.App.4th 603, 615, 91 Cal.Rptr.3d 571 (3d Dist.2009). Plaintiffs may not raise an issue in litigation unless it was first presented to the agency. Cal. Pub. Res. Code § 21177(a). "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." *Tracy First v. City of Tracy,* 177 Cal.App.4th 912, 926, 99 Cal.Rptr.3d 621 (3d Dist.2009) (alteration in original) (internal quotation marks and citation omitted). The burden is on plaintiffs to show the issues they raise before the court were first raised before the agency. *Id.*

### B. *Compact*

Under the Compact, the applicable standard of review for an agency's adjudicatory act or decision to approve or disapprove a project is "prejudicial abuse of discretion," which is established when "the agency has not proceeded in manner required by law or if the act or decision of the agency was not supported by substantial evidence in light of the whole record." (Compact art. VI(j)(5).) In making this determination, the court should "not exercise its independent judgment on evidence" but rather "only determine whether the act or decision was supported by substantial evidence." (*Id.*) The applicable

standard of review for a legislative act or decision of the agency extends only to whether the act or decision was arbitrary, capricious, or without substantial evidence or whether the agency failed to proceed in a manner required by law. (*Id.*)

The Compact does not contain a statutory issue-exhaustion requirement. It provides that "any aggrieved person may file an action" that "alleg[es] noncompliance with the provisions of this compact." (*Id.* art. VI(j)(3).) An "'aggrieved person' means any person who has appeared ... before the agency at an appropriate administrative hearing to register objection to the action which is being challenged ...." (*Id.*) Cases finding a statutory issue-exhaustion requirement rely on language that clearly demands objection to a particular issue, rather than to the challenged action. *See, e.g., Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (finding an issue-exhaustion requirement where statutory language provided that "'[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances'" (quoting 29 U.S.C. § 160(e))); *Wash. Ass'n for Television & Children v. FCC,* 712 F.2d 677, 681 (D.C.Cir.1983) (locating issue-exhaustion requirement in statutory language providing that "'[t]he filing of a petition for rehearing shall not be a condition precedent to judicial review of [an FCC decision] except where the party seeking such review ... relies on questions of law or fact upon which the Commission ... has been afforded no opportunity to pass'" (quoting 47 U.S.C. § 405 (second alteration in original))); *see also id.* at 681 n. 6 (collecting statutes).[8] The Compact's pro-

---

**8.** Defendants cite *Unemployment Compensation Commission of Alaska v. Aragon,* 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946), as

interpreting a statute worded similarly to the Compact to require issue exhaustion. However, the Supreme Court distinguished that

vision does not use words or phrases comparable to "issue" or "grounds for objection," which would indicate that the statute requires objection to a particular issue before the agency if that issue is to be raised during litigation.

Instead, the Compact's provision regarding aggrieved persons sets limitations on who may challenge TRPA's decisions under the statute. *See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.,* 514 U.S. 122, 126, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995) (*"Newport News"*) ("The phrase 'person adversely affected or aggrieved' is a term of art used in many statutes to designate those who have standing to challenge or appeal an agency decision, within the agency or before the courts."). The judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, entitles "[a] person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute" to judicial review. "In that provision, the qualification 'within the meaning of a relevant statute' is not an addition to what 'adversely affected or aggrieved' alone conveys; but is rather an acknowledgment of the fact that what constitutes adverse effect or aggrievement varies from statute to statute." *Newport News,* 514 U.S. at 126, 115 S.Ct. 1278. The Compact appears to contemplate the model proposed by the APA; by defining "aggrieved person," it delineates who has standing under the statute.

■ Even where administrative issue exhaustion is not statutorily required, a court may apply a "judicially imposed issue-exhaustion requirement." *Sims v. Apfel,* 530 U.S. 103, 108, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).[9] Whether a court should impose such a requirement depends on the extent to which the particular administrative proceeding is analogous to normal adversarial litigation. *Id.* at 109–10, 120 S.Ct. 2080. However, even though there is no statutory issue exhaustion requirement in the National Environmental Policy Act ("NEPA") and it does not provide for any procedures akin to an adversarial proceeding, the Supreme Court has imposed an issue-exhaustion requirement for NEPA plaintiffs. *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); *see Lands Council v. McNair,* 629 F.3d 1070, 1076 (9th Cir.2010) ("A party forfeits arguments that are not raised during the administrative process."); *see also High Sierra Hikers Ass'n v. U.S. Forest Serv.,* 436 F.Supp.2d 1117, 1148 (E.D.Cal.2006) (explaining that *Sims's* test for applying a judicially imposed issue-exhaustion requirement has been narrowed by *Public Citizen*). As the Court explained, "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it ... alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Public Citizen,* 541 U.S. at 764, 124 S.Ct. 2204 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 543, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (alterations in original)).

case in *Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000), explaining that it "spoke favorably of issue exhaustion in [*Aragon*], without relying on any statute or regulation ...." *Id.* at 2085.

9. Plaintiffs cite *Montes v. Thornburgh,* 919 F.2d 531 (9th Cir.1990), for a three-part test that a court may use to determine if it should apply a prudential issue-exhaustion requirement. However, the *Montes* test is for the exhaustion of administrative remedies, rather than issue exhaustion. *Id.* at 537. *Cf. Sims,* 530 U.S. at 107, 120 S.Ct. 2080 (explaining that the issue-exhaustion requirement is not necessarily "an important corollary" of any requirement of remedy exhaustion).

■ The purpose of requiring issue exhaustion is to allow "administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the [administrative] process." *Lands Council,* 629 F.3d at 1076. As explained, the Compact, like NEPA, does not have an issue-exhaustion provision. However, as in the NEPA context, the Compact requires the preparation of an EIS, which facilitates public comments and responses by the agency. The EIR–EIS process here provided plaintiffs with an opportunity to raise the issues they considered relevant and allowed TRPA to give "meaningful consideration" to those issues. There was an opportunity for TRPA to use its expertise, correct its mistakes, and avoid otiose judicial intervention. Because the Compact's EIS requirements provide for public participation and agency response to the same extent as does NEPA, and allow for the purposes of issue exhaustion to be met, the court finds that an issue-exhaustion requirement applies.[10]

### III. *Amendments to the Regional Plan and Code*

#### A. *Legal Standard*

Under Article VI(j)(5) of the Compact, the scope of judicial review of legislative acts or decisions by TRPA extends only to questions of whether the act or decision was "arbitrary, capricious or lacking substantial evidentiary support or whether the agency has failed to proceed in a manner required by law." Both parties draw on cases interpreting the scope of the court's review under the APA to explain the extent of the court's review under the Com-

pact. This is reasonable given the similar language of the judicial review sections of the APA and the Compact. *See* 5 U.S.C. § 706(2)(A), (E); *League,* 739 F.Supp.2d at 1267 (noting that the parties characterize the standard of review as essentially the same as that used under the APA and citing APA caselaw).[11]

■ An agency's legislative action is considered arbitrary and capricious when the agency relied "on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Under this standard, the court's scope of review is narrow and it must not "substitute its judgment for that of the agency." *Id.*

The parties dispute whether the prohibition against agency "ad hocery" also applies only to agency adjudicative actions or also to TRPA's legislative actions. In *Ramaprakash v. FAA,* 346 F.3d 1121 (D.C.Cir.2003), the court explained that "the core concern underlying the prohibition of arbitrary or capricious agency action is that agency 'ad hocery' is impermissible." *Id.* at 1130 (internal quotation marks and citation omitted). It held that the National Transportation Safety Board ("NTSB") engaged in such ad hocery when it departed from its precedent *without any reasoned explanation* in deciding whether

---

10. The court does not decide if the issue-exhaustion requirement applies in the absence of the environmental review process.

11. Judicial review under the APA requires a court to set aside agency actions, findings,

and conclusions found, among other things, to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

the Federal Aviation Administration could suspend Ramaprakash's pilot certificate. *Id.* at 1125. Most consequentially, the NTSB abandoned its decades-old requirement of prosecutorial diligence in investigating possible violations of the Federal Aviation Regulations. *Id.* at 1127–28. It also indicated that whether the departures announced in Ramaprakash's case would apply in the future would depend on the facts of specific cases. *Id.* at 1130. The court expressed dismay at the resulting uncertainty, concluding:

> We have it on high authority that "the tendency of the law must always be to narrow the field of uncertainty." O.W. Holmes, *The Common Law* 127 (1881). The Board's unexplained departures from precedent do the opposite. "[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious."

*Id.* at 1130 (second citation omitted).

Defendants attempt to cordon off "ad hocery" as a specific restraint on agencies only in their adjudicative actions, but the court does not give the phrase such talismanic significance. The challenge in *Ramaprakash* to the policy change evident in the NTSB's adjudicatory determination was brought under § 706(2)(A) of the APA, which prohibits arbitrary and capricious action. *Id.* at 1124. *State Farm* interpreted the same provision and required a comparable explanation for an agency's legislative act that marked a change in course: "a reasoned analysis for the change." 463 U.S. at 42, 103 S.Ct. 2856 (reviewing agency's promulgation of an informal rule); *see also Redding Rancheria v. Salazar,* 881 F.Supp.2d 1104, 1119–20 (9th Cir.2012) (explaining that an agency changing course in its regulations

must provide an explanation for the change). *Ramaprakash* and *State Farm* reviewed different kinds of agency actions, but the point from both decisions is the same: agencies should provide reasonable explanations when they embark on policy change. If there is any difference between an agency's failure to explain change under *Ramaprakash* and *State Farm,* it would seem to be only that an agency engaging in ad hocery commits a more blatant violation of the prohibition against arbitrary and capricious agency action such that the course its policy will follow is wholly unpredictable.

The similarity between the standards is borne out by subsequent caselaw. In *American Federation of Labor v. Chertoff,* 552 F.Supp.2d 999 (N.D.Cal.2007), the court considered whether the Department of Homeland Security acted arbitrarily and capriciously in promulgating a final rule that departed from its historical position regarding the knowledge imputed to employers who receive no-match letters from the Social Security Administration ("SSA") indicating that an employee's name and Social Security Number on a wage form do not match the SSA's own records.[12] *Id.* at 1009. Although it did not use the phrase "ad hocery," the court quoted *Ramaprakash* for the proposition that:

> [A]gency action is arbitrary and capricious if it departs from agency precedent without explanation. Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.

*Id.* at 1009 (quoting *Ramaprakash,* 346 F.3d at 1124–25). Even though *Chertoff*

---

**12.** Although *Chertoff* analyzed the agency's action for purposes of a preliminary injunction motion, the court cites the case only for its statement of the law. *See* 552 F.Supp.2d at 1009–10.

considered an agency's legislative action, it relied on *Ramaprakash* without qualification, affirming the court's determination that there is no significant difference between what *State Farm* requires and "ad hocery" prohibits. Assuming, however, that some heightened standard under *Ramaprakash* applies, for the reasons explained below, the court finds that TRPA did not violate even this.

### B. *TRPA's Adoption of Amendments to Expand Access to TAUs*

Prior to constructing new tourist accommodations, such as hotels, the Regional Plan and Code require that developers first receive an allocation of TAUs. (RP at II–5); Code § 33.4.A. Before the Project's approval, the Regional Plan required that projects "be permitted additional [TAUs] as specified within a community plan," (RP at II–5), and that "[n]o bonus [TAUs] shall be allowed for projects outside adopted community plans," (*id.* at VII–15; *see also id.* at II–5 ("Based on demonstrated need, projects may be permitted additional [TAUs] as specified within a community plan.")). Likewise, the Code required that bonus TAUs be limited to "projects" and "parcels" within adopted community plans. Code §§ 33.4.A. (3), 35.3. Additionally, most of the Project is located in PAS 157, which requires that "[a]ny new or additional commercial uses shall be permitted only pursuant to an adopted [c]ommunity [p]lan." (AR 2962.)

PASs guide planning by setting the land-use requirements for the different areas of the Region. (RP at I–5.) Certain areas within the Region are designated by the Regional Plan as eligible for community plans, which may be adopted to super-sede a PAS. (*Id.*) Adoption of a community plan is not mandatory, (*id.* at II–6), but may commence "as a result of a local government request, or by Agency initiative in recognition of local interest," (*id.* at II–7); *see also* Code § 14.6.A(1). Among other elements, community plans must include an "assessment of needs, opportunities, limitations, and existing features" and a "statement of goals and objectives for the area." (RP at II–7.) "It is [TRPA's] goal that each proposed community plan . . . will have addressed the needs and concerns of the community . . ." (*Id.* at II–8.) A "master plan" is another kind of detailed plan that is intended "to augment [PASs] or community plans" and "to provide more detailed planning to ensure that projects and activities are consistent with the Goals and Policies [of the Regional Plan], the [PASs] or community plans, and the Code.[13] Code § 16.0. It may also replace the PAS.[14] (RP at I–5.)

Homewood was an area identified for community planning and part of the Project area is designated as "a preliminary community plan area," meaning it is eligible for a community plan. (*See* AR 2964, 19063, 19072.) Homewood, however, does not currently have a community plan, and at the time the Project was proposed, some commentators requested a plan be adopted. (*Id.* at 1471, 1479, 1531 (commenting on Notice of Preparation of Draft EIR–EIS); TAR 9962.) Instead of preparing a community plan for the area, TRPA amended the Regional Plan and Code to allow allocation of additional TAUs under either a community plan "or a ski area master plan," as well as Plan Area 157 to allow new or additional commercial

---

13. Under the Plan, land use classifications include conservation, recreation, residential, commercial and public service, and tourist areas. (RP at II–3–4.) The chosen classifications set the allowable land uses within the PAS.

14. The Code has an apparently contradictory requirement: "Specific or master plans shall supplement, but shall not replace, plan area statements and community plans . . . ." Code § 16.5.

**1114**

uses pursuant to either type of plan (collectively, the "Amendments").[15] (*See id.* at 224, 623, 644–45.)

■ Plaintiffs argue that the "new alternative" for allocating TAUs and commercial floor area through the ski area master plan process fails to satisfy the objectives of the Compact and Regional Plan. (Pls.' Mem. in Supp. of Summ. J. ("Pls.' Mem.") at 14:24 (Docket No. 40–1).) They view the Compact and Regional Plan as mandating regional planning to take into account the Region's needs "as a whole" and requiring consideration of community needs before approval of additional development. They argue that because master plans are not designed to be responsive to the Region's and community's needs, TRPA's adoption of the Amendments marks a departure from TRPA's prior practice. In other words, TRPA has departed from its former policy in two ways: (1) the Region's and community's needs are no longer considered in land-use planning, despite the Compact and Regional Plan's clear intent that they be considered and (2) those needs are no longer determined through the community planning process. (Pls.' Reply 3:5–10 (Docket 55–1).) Finally, plaintiffs argue that TRPA departed from that practice without explaining why it changed its course; that is, *"without any rational justification."* (*Id.* at 3:6–7.)

Initially, defendants dispute that TRPA changed course or reversed its policy such that an explanation of the change is required. A reversal would more clearly be before the court if TRPA had approved amendments to prohibit allocation of TAUs through community plans and instead dis-

tribute them only through the ski area master plan process, or if it had previously found that ski area master plans should not be used to allocate TAUs. TRPA instead suggests that it merely expanded incentives that it previously found to be environmentally beneficial. *Cf. Redding Rancheria,* 881 F.Supp.2d at 1119–20 (analyzing agency's decision to apply temporal limitation as a bright-line rule rather than on a case-by-case basis as a change in course).

In setting out the required findings for the Amendments, TRPA explained that the amendments to the Regional Plan are consistent with the existing Regional Plan because they "will facilitate implementation of the Regional Plan, in terms of both threshold attainment and orderly growth and development, by providing incentives for an economically, environmentally and socially sustainable project that results in threshold-related improvements ...." (TAR 678.) It stated further that:

> The amendments do not increase the fixed number of bonus units originally allocated in the Regional Plan. Further, just as is required for projects in Community Plans, projects in Ski Area Master Plans proposing to use bonus units must demonstrate substantial environmental benefits and provide a match of existing tourist accommodation units through a transfer pursuant to Code Chapter 34. As such, the proposed amendments expand incentives already embodied in the Regional Plan to Ski Area Master Plans to realize environmental gain.

(*Id.* at 678.) There is substantial evidence to support TRPA's conclusion that the

---

15. In their reply, plaintiffs depart from the argument made in their opening brief that TRPA's decision not to create a community plan "was arbitrary and unlawful." (Pls.' Mem. in Supp. of Summ. J. ("Pls.' Mem.") at 14:3–7 (Docket No. 40–1).) In their reply,

they clarify that they object that "TRPA changed the rules for obtaining additional development rights in ski areas *without any rational justification.*" (Pls.' Reply at 3:6–7 (Docket 55–1).)

benefits it ascribes to the Amendments will accrue. For example, TRPA explains that the Project will bring "threshold-related improvements to water quality, SEZ, soil conservation, recreation, air quality, transportation and scenic quality." (*Id.* at 678.)

Even assuming the Amendments mark a change in course, TRPA has provided an adequate explanation for any shift. TRPA states that it expanded the means of allocating TAUs to provide incentives for a project that brings various environmental benefits and will facilitate implementation of the Regional Plan. It also explained that by allowing TAUs to be allocated in an additional way, projects that bring environmental benefits will be further incentivized because they can now receive TAUs through either a ski area master plan or a community plan. TRPA therefore adequately acknowledged the "change" the Amendments mark (expanding how TAUs can be allocated) and explained why it was making that change.

For the same reasons, the court also rejects the argument that TRPA's only rationale for the Amendments was to " 'enabl[e]' Project implementation" and that TRPA cannot justify Regional Plan or Code amendments simply to accommodate a project. (Pls.' Mem. at 16:1–2.) The court acknowledges plaintiffs' concern that approval of specific projects should not drive broader land-use planning. But TRPA did provide a reasonable basis for adopting the Amendments and, assuming it must also give an explanation as to why

the Amendments will be beneficial going forward, its explanation did so.[16]

Plaintiffs cite *Western States Petroleum Ass'n v. EPA*, 87 F.3d 280 (9th Cir.1996), for the proposition that an agency changing its course must supply a reasoned analysis for the change. There, the EPA rejected Washington's proposed permitting program for emissions because it would have exempted insignificant emissions units ("IEUs") from monitoring, reporting, and record-keeping requirements set by EPA regulations. *Id.* at 283. The court held that the EPA abused its discretion because these grounds for rejection were in direct contradiction to its prior precedent—on eight other occasions—approving programs that omitted IEUs from those requirements. *Id.* at 285. While the proposition is not mistaken, the difference between the EPA's unexplained reversal stands in stark contrast to the reasoned explanation provided by TRPA for its shift in practice. *See also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir.2007) (requiring reasoned analysis for departure from longstanding practice)

. It is also clear that TRPA has not made a wholesale departure from any policy of community participation. Plaintiffs argue that circumventing the community planning process "foreordained a Project that met JMA's *private* objectives" to construct enough residential and tourist accommodation units to generate sufficient revenues to ensure the continued viability of the ski operations.[17] (Pls.' Reply at 10:15.) How-

---

**16.** Plaintiffs argue that defendants should have explained why the change in course is justified going forward with respect to all projects that require additional TAUs in a ski area, why demonstrated need should no longer be determined through the community plan process, and why ski area master plan areas should be singled out among all master plan areas. This level of justification is not required, however, by the Compact. *See*

Compact art. V(g) (describing standard of review as "arbitrary, capricious or lacking substantial evidentiary support or whether the agency has failed to proceed in a manner required by law").

**17.** *National Parks & Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058 (9th Cir.2010), is inapposite. In that case, the Ninth Circuit rejected an agency's statement

ever, defendants explain that JMA created an outreach program that TRPA concluded provided the public with an adequate means to shape the Project and determine the Project's needs. (*See* AR 3918–19; TAR 744.) While the level of community participation in preparing the ski area master plan did not have the same depth as would have been required for a community plan, it was not so scant as to be deemed nonexistent or to substantiate claims that TRPA completely reversed its policy course.[18]

Finally, plaintiffs' arguments are misguided to the extent that they imply that TRPA should not have amended the Regional Plan and Code to allow the ski area master plans to be used for some of the same purposes as community plans because the latter are a better method of meeting those purposes. It is the responsibility of TRPA to balance benefits and harms and make the policy choice it believes to be best. *Cf. Redding Rancheria,* 881 F.Supp.2d at 1120 ("But of course the Tribe is not the one who determines whether the Regulations were a necessary or advisable means of implementing the ambiguous Restored Lands Exception. Neither is this Court.... Congress en-

trusted that determination to Interior."). TRPA provided a reasonable explanation for the Amendments; this is all the Compact requires. Accordingly, the court finds that TRPA's adoption of amendments to the Regional Plan, Code, and PASs to allow for allocation of TAUs through the ski area master plan process did not violate the Compact.

## C. *Code Amendments' Consistency with the Code*

▪▪ Plaintiffs also argue that the amendments to the Code could not be approved because they are not consistent with the Code. *See* Code § 6.3.A(1) (requiring TRPA to find that new Code amendments are "consistent with, and will not adversely affect the implementation of the Regional Plan, including ... the Code"). Plaintiffs locate a discrepancy in that although the new Code amendments alter several Code provisions to allow allocation of TAUs through ski area master plans, Code subsection 33.4.A(3)(d) still requires that the "[d]istribution of units within the community plan shall be pursuant to the provisions of the adopted community plan and ... [a] demonstration of need for additional units is shown pursuant to Chapter 14." [19] Plaintiffs argue that

---

of purpose required for the EIS process as too narrow under the reasonableness standard because the majority of its objectives were the project proponent's and not the agency's. *Id.* at 1970–71. Likewise, *Environmental Protection Information Center v. U.S. Forest Service,* 234 Fed.Appx. 440 (9th Cir.2007), rejected the Forest Service's range of alternatives because it had defined the objectives of the project in the EIS so narrowly that only the proposed project would serve those objectives. *Id.* at 443–44.

18. Plaintiffs also argue that the ski area master plan process precluded the assessment and development of alternatives based on community needs. It is unclear what plaintiffs mean by "alternatives," as they state on reply that they are not here referring to the EIR–EIS's alternative analysis. (Pls.' Reply at 9:13–15.) Plaintiffs appear to argue that

the community could not participate in the formulation of the Project's *objectives* during the ski area master plan process in the same way they might with community planning. (*See id.* at 9:8–10:16.) This argument has little force, however, because there is no requirement that defendants use a community plan rather than a ski area master plan and therefore no requirement that the Project's objectives be shaped by the community rather than JMA. To the extent this argument is a reformulation of plaintiffs' contention that TRPA adopted the Amendments without a rational basis, the court rejects it for the reasons stated above.

19. The Code amendments necessary to allocate TAUs are to Chapters 33 (Allocation of Development) and 35 (Bonus Unit Incentive Program). (AR 2791.)

Chapter 14 provides a detailed process to determine and respond to community needs and that because the ski area master plan does not even require a showing of "demonstrated need" for additional TAUs, much less implicate the Chapter 14 process, that the amendments are inconsistent with the Code.

The court declines to consider this argument, however, because plaintiffs failed to raise the issue during the administrative process. It is waived.

D. *Role of the Amendments in Land–Use Planning*

Plaintiffs argue that the Compact and Regional Plan "clearly indicate that general land-use planning, including the Plan, Code and PASs, must come *before* site-specific project approvals; planning and project approval must not happen simultaneously." (Pls.' Mem. at 16:17–19.) The court finds that plaintiffs adequately, if imperfectly, raised this argument. (*See, e.g.,* AR 6186 (comment from Sierra Club).)[20]

*In Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir.1998), the Ninth Circuit held that under the Forest Plan at issue, an area analysis must be conducted before a project-specific EIS, rather than concurrently. *Id.* at 1069. There, the plan stated that "[p]roject implementation will normally consist of detailed site planning and project design within the project locations *identified through Area Analysis.*" *Id.* at 1069 (internal quotation marks omitted) (emphasis in original). It also provided that "NEPA procedures will be followed and project-related environmental analysis *will be tiered* to the appropriate Area Analysis doc-

umentation." *Id.* (internal quotation marks omitted) (emphasis in original).

Neither the Compact, Plan, or Code compel action in a way that parallels the strong temporal requirements in the Forest Plan. The Compact provides that "[n]o project may be approved until it is found to comply with the regional plan …." (Compact art. VI(b).) Likewise, the Regional Plan explains that the required planning documents, as well as the Compact, "provide the basic framework for judging the merits of individual projects." (RP at I–4.) Master plans are intended "to provide more detailed planning to ensure that projects and activities are consistent with the Goals and Policies, the [PASs] or community plans, and the Code." Code § 16.0. These requirements put limitations on the context in which a project is developed, but they do not preclude consideration of their amendment at the same time a project is being developed.

Nor is the ski area master plan dependent on the broader planning documents in the same sense as the project analysis was dependent on the area analysis in the Forest Plan. The ski area master plan process is guided by those documents, but they do not require any specific analysis particular to a project before additional analysis for that project may commence. Additionally, the Compact, Plan, and PASs were in place during the Project's development and drove the ski area master plan process, even though TRPA concluded that some alterations were appropriate to allow the Project to go forward. *Cf. Goleta I*, 52 Cal.3d at 573, 276 Cal.Rptr. 410, 801 P.2d 1161 ("[I]t may not be appropriate … to disregard an otherwise reasonable alterna-

---

**20.** The Sierra Club commented that "[t]he TRPA process that permits this overwhelming change that envelopes the PAS, the CP and uses the CEP to do more than was ever previously envisioned is not a process that turns the Regional Plan on its head, it is a calculated decision by the TRPA to do just that, without declaring that the action amends the Regional Plan." AR 6816.

tive which requires some form of implementing legislation.... Moreover, in some circumstances, an EIR may consider alternatives requiring a site-specific amendment of the general plan. However, an EIR is not ordinarily an occasion for the reconsideration or overhaul of fundamental land-use policy."). Even though some elements of the Project conflicted with those provisions, that does not mean they did not serve the role plaintiffs deem they should have.

### E. Retroactive Waiver of Noncompliance with Community Planning Requirement

Plaintiffs argue that TRPA attempted to retroactively excuse TRPA's failure to complete a community plan. They contend that because the requirements in place at the time the Project was developed required TRPA to use the community planning process to allocate additional TAUs and commercial space, TRPA had to use the community planning process. Instead of creating a community plan, plaintiffs argue that defendants proceeded as though the community planning requirement did not exist and then waived it at the same hearing at which the Project was approved, contrary to law. Defendants, however, have asserted that plaintiffs failed to exhaust this claim. Plaintiffs provide no response and the court therefore assumes that they concede the point.

### IV. Adequacy of the EIR–EIS's Alternatives Analysis and TRPA's and the County's Related Findings

The Project's objectives are five-fold. (AR 2748.) They are to: (1) construct onsite residential and tourist accommodation units to increase midweek skier visits at the resort; (2) optimize the quality of the winter ski experience and improve the year-round use of the site; (3) maintain consistency with the scale and character of Homewood, California; (4) enhance the lifestyle and property values of West Shore residents; and (5) generate sufficient revenues to support the Project's proposed environmental and fire safety improvements, as well as the economic viability of the ski operations. (Id. at 2738–39.)

The Draft EIR–EIS considered six alternatives designed to meet some or all of these objectives. (See id. at 268–70.) The Final EIR–EIS added a seventh alternative, which is a revised version of the Project, created based on public input on the draft. (Id. at 2691–92.) Alternative 1 is the proposed project and it proposed to redevelop the North Base area, adding new mixed-use buildings and new residential units; build a lodge at the Mid–Mountain Base area and other amenities like a detached gondola terminal, a new learn-to-ski lift, and an outdoor swimming facility; and convert the South Base area to residential uses. (Id. at 2691.) The proposed project required the amendments related to TAU transfers considered in part III.A, supra, as well as amendments to the Code's provisions on height and grading standards and to three PASs. (Id.) Alternative 1A is the revised proposed project. (Id. at 2691–92.) This alternative replaced two of the three large multi-family residential condo buildings at the South Base area with twenty-four smaller chalet buildings, reducing the total number of multi-family residential units from 99 in Alternative 1 to 95 in Alternative 1A. (Id. at 2692.)

Alternative 2 is no project and Alternative 3 is similar to the proposed project, but required no Code amendment to building height. (Id.) Alternative 4 proposed to close the ski resort and put in estate residential lots and one commercial lot; it required an amendment to a PAS. (Id.) Alternative 5 reduced the size of the Project area, but still required amendments to the Code (regarding height) and the PASs, although it did not require an amendment

to change PAS boundaries and thereby expand the urban boundary of the project. (*Id.* at 2692–2693.) Alternative 6 is the reduced-size alternative, which proposed to reduce the number of total tourist accommodation and residential units by approximately fifteen percent (from 336 to 284 tourist accommodation and residential units). (*Id.* at 2693, 2750–51.)

### A. Adequacy of the EIR–EIS's Alternatives Analysis Under CEQA

CEQA recognizes that "it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." Cal. Pub. Res. Code § 21002. To implement this policy, CEQA requires the consideration and analysis of project alternatives that would reduce adverse environmental impacts. *Mount Shasta Bioregional Ecology Ctr. v. Cnty. of Siskiyou,* 210 Cal.App.4th 184, 197, 148 Cal.Rptr.3d 195 (3d Dist.2012); *In re Bay–Delta Programmatic Envtl. Impact Report Coordinated Proceedings,* 43 Cal.4th 1143, 1163, 77 Cal.Rptr.3d 578, 184 P.3d 709 (2008) (*"In re Bay–Delta"*). The court reviews the EIR–EIS's selection of alternatives and its analysis of those alternatives to determine if they comply with CEQA's procedural mandates and then decides whether substantial evidence supports the decisions made. *Cal. Native Plant Soc.,* 177 Cal.App.4th at 988, 99 Cal. Rptr.3d 572.

### 1. No–Amendment Alternative

Plaintiffs first contend that the EIR–EIS failed to consider a reasonable range of alternatives because it did not consider any alternative that required no amendments to the Regional Plan, Code, or PASs.[21] Requests for analysis of such an alternative were made during the scoping process. (*See* AR 2752–55.) Plaintiffs argue that the EIR–EIS did not provide a reasonable basis for omitting a no-amendment alternative because it only explained that "[t]here is no legal requirement that an alternative be considered" that requires no amendments. (*Id.* at 3923.) Second, they argue that defendants have adopted a litigation position that the EIR–EIS properly rejected a no-amendment alternative because it would not allow for overnight lodging, contrary to the Project's objectives, which is not supported by the record.

"Generally, an agency's selections of alternatives will be upheld as long as there is a reasonable basis for the choice it has made." *City of Maywood v. L.A. Unified Sch. Dist.,* 208 Cal.App.4th 362, 416, 145 Cal.Rptr.3d 567 (2d Dist.2012). Clearly, the EIR–EIS's explanation that it is not legally required to consider a certain alternative would be inadequate standing alone because no particular alternative is legally required; the rule of reason controls the selection of alternatives. *See Citizens of Goleta Valley v. Bd. of Supervisors,* 197 Cal.App.3d 1167, 1177, 243 Cal. Rptr. 339 (2d Dist.1988) (*"Goleta II"*). However, the EIR–EIS also explains that "[a]n alternative that eliminates overnight lodging would be inconsistent with HMR's objective to transform Homewood into an overnight destination." (AR 3923.) Although plaintiffs protest that this explanation is not explicitly linked to a no-amendment alternative, defendants assert that it

---

**21.** Plaintiffs clarify in their reply that they are not arguing that the alternatives in the EIR–EIS improperly focused on meeting JMA's objectives and that therefore the range of alternatives analyzed in the EIR–EIS was im-
properly narrow. (Pls.' Reply at 27:8–10.) The court therefore does not address defendants' arguments as they apply to this point. (*See* Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem.") at 29–32 (Docket No. 47–1).)

applies because the no-amendment alternative is an alternative that does not provide overnight lodging. The connection between the no-amendment alternative and overnight lodging explanation could have been clearer, but this explanation would have sufficed, if it were certain that a no-amendment alternative could not provide overnight lodging. *Cf. City of Maywood,* 208 Cal.App.4th at 416–18, 145 Cal. Rptr.3d 567 (finding explanation that proposed reduced-sized alternative would not comply with regulations regarding student density for high schools to be a reasonable basis for not including the alternative in the EIR).

At oral argument, the parties continued to dispute whether the no-amendment alternative could provide overnight lodging. The record shows that without any amendments to the PASs, the Project's residential and tourist accommodation units would be placed largely in PAS 157. (*See* AR 2790.) Although the allowable uses in PAS 157 include bed and breakfast tourist accommodations and hotel, motel, and other transient tourist accommodation units, (*id.* at 2962–63), developing those uses would require the transfer of TAUs into PAS 157, (*id.* at 2988–89). However, because PAS 157 is not designated as a "receiving area," such tourist lodging could not be built without an amendment to PAS 157 to make it eligible to receive TAUs from other areas. (*Id.*) Plaintiffs focus on PAS 159, which is such a receiving area. (*Id.* at 19051.) But only a very slim portion of the Project area is within PAS 159.

Defendants do not contest, however, that single-family residential units could be built in PAS 157 without amendment. The Project's objective pertaining to overnight accommodations is to "construct[ ] . . . on-site residential and tourist accommodation units." (*Id.* at 2738.) A no-amendment alternative would arguably meet this objective by providing residential units. More importantly, even if the no-amendment alternative did not meet all of the Project's objectives, that alone is an insufficient reason to reject it. *See In re Bay–Delta,* 43 Cal.4th at 1165, 77 Cal.Rptr.3d 578, 184 P.3d 709 (explaining that "an EIR should not exclude an alternative from detailed consideration merely because it 'would impede to some degree the attainment of the project objectives'" unless it is otherwise infeasible or the lead agency has determined that it cannot meet the project's underlying fundamental purpose (quoting Guidelines § 1516.6(b))); *Watsonville Pilots Ass'n v. City of Watsonville,* 183 Cal.App.4th 1059, 1088, 108 Cal. Rptr.3d 577 (6th Dist.2010) (rejecting claim that reduced development alternative did not require analysis in EIR simply because it could not satisfy every objective for the city's new general plan).[22] Thus, defendants have failed to articulate a reasonable basis for not evaluating a no-amendment alternative.

Although the EIR–EIS did not provide an explanation for its exclusion of a no-amendment alternative, CEQA requires only that an EIR analyze "those alternatives necessary to permit a rea-

---

22. In their briefs, defendants construe the analysis in the EIR–EIS that a no-amendment project would not meet one of the project's objectives as a finding that such an alternative would not meet the fundamental purpose of the project. (Defs.' Mem. 36:7–9.) An alternative that does not meet a project's fundamental purpose need not be considered. *In re Bay–Delta,* 43 Cal.4th at 1165, 77 Cal.Rptr.3d

578, 184 P.3d 709. If it were the case that the no-amendment alternative fails to meet the Project's fundamental purpose by providing only residential accommodations and that the EIR–EIS rejected it for that reason, the court's conclusion that the EIR–EIS did not need to consider a no-amendment alternative would only be strengthened.

soned choice." *Goleta II,* 197 Cal.App.3d at 1177–78, 243 Cal.Rptr. 339. There is "no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." *Goleta I,* 52 Cal.3d at 566, 276 Cal.Rptr. 410, 801 P.2d 1161; *see also Mira Mar Mobile Cmty. v. City of Oceanside,* 119 Cal. App.4th 477, 487, 14 Cal.Rptr.3d 308 (4th Dist.2004) (*"Mira Mar"*) ("The discussion of alternatives is subject to a rule of reason .... ").

■ The alternatives analysis must at least "describe a range of reasonable alternatives to the project ... which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project ...." Guidelines § 15126.6(a); *see also Goleta I,* 52 Cal.3d at 566, 276 Cal.Rptr. 410, 801 P.2d 1161 (requiring range of alternatives that offer substantial environmental advantages and are feasible). "Absolute perfection" is not required of the agency's selection of alternatives; rather, the "key issue is whether the alternatives discussion encourages informed decision-making and public participation." *Cal. Oak Found. v. Regents of Univ. of Cal.,* 188 Cal.App.4th 227, 276, 115 Cal. Rptr.3d 631 (2010). The party disputing the adequacy of the agency's chosen alternatives must demonstrate that "the agency failed to satisfy its burden of identifying and analyzing one or more potentially feasible alternatives.... [It] may not simply claim the agency failed to present an adequate range of alternatives and then sit back and force the agency to prove it wrong." *Mount Shasta Bioregional Ecology Ctr.,* 210 Cal.App.4th at 199, 148 Cal. Rptr.3d 195.

The EIR–EIS analyzed seven alternatives. No alternative, except for Alternative 2 (no project) was a no-amendment alternative. Alternative 4 required only one modification to a PAS, but it is also closed the ski resort. Plaintiffs contend that a no-amendment alternative would have allowed for consideration of a project that could avoid significant impacts by preserving the environmental protections the Regional Plan, Code, and PASs provide and also meet most of the developer's objectives. Defendants argue that the EIR–EIS considered a reasonable range of alternatives, that a no-amendment alternative would merely fall within the range of those already analyzed in the EIR–EIS, and that the EIR–EIS did not need to analyze another alternative that did not meet the Project's primary purpose.[23]

To show that the range of alternatives examined in the EIR–EIS was unreasonable, plaintiffs analyze each selected alternative and conclude that only Alternative 6 is a potentially viable alternative to the Project. (*See* Pls.' Reply at 15–17.) Plaintiffs note that the alternatives identified by defendants as focusing on what the Project would look like without amending the Code, Alternatives 3 and 5, actually require extensive amendments (thereby still allowing significant land-use changes) and did not offer any environmental advantages over the Project. (*Id.*) Plaintiffs scrutinize Alternatives 2 and 4, which required, respectively, no amendments or one amendment to a PAS, as failing to meet the Project's objectives. (*Id.* at 17.)

"[A]lternatives need not satisfy all project objectives, they must merely meet 'most' of them." *Mira Mar,* 119 Cal. App.4th at 489, 14 Cal.Rptr.3d 308 (2004). Plaintiffs are correct that Alternative 4's

**23.** Because the court rejects defendants' contention that a no-amendment alternative could not meet the objective of providing overnight residential and tourist accommodation units, it finds the argument misdirected here as well.

proposal to build estate homes did not meet most of the Project's objectives and therefore does not contribute to a reasonable range of alternatives. However, Alternative 2, the no-project alternative, does contribute to such a range. *Cf. Mount Shasta Bioregional Ecology Ctr.,* 210 Cal. App.4th at 199, 148 Cal.Rptr.3d 195 (EIR–EIS that analyzed only no project alternative and proposed project considered reasonable range of alternatives). And although alternatives that have the same or worse environmental impacts as the proposed project do not further CEQA's purposes, they may be helpful in identifying which features of the proposed project are more or less environmentally friendly. *Cf. id.* at 490, 14 Cal.Rptr.3d 308 (explaining that alternatives that have comparable or worse impacts to the proposed project do not further CEQA's purposes and declining to condone their inclusion in the EIR). Despite the flaws with Alternatives 3 and 5, the EIR–EIS still analyzed two alternatives that reduced the environmental impacts of the project: the no-project alternative and a reduced-size alternative.

The range of alternatives considered by the EIR–EIS is reasonable. The EIR–EIS compared and contrasted six alternatives (besides the proposed project). With this range, the public and decision makers could compare the environmental impacts of closing the Resort, reducing the size of the proposed project, and adjusting the proposed project in different ways with the proposed project's environmental impacts. This array of alternatives "represent[s] enough of a variation to allow informed decision making." *Id.* at 412, 145 Cal. Rptr.3d 567 (internal quotation marks omitted). And "if an EIR discusses a reasonable range of alternatives, it is not rendered deficient merely because it excludes other potential alternatives." *Id.*

This range is not legally deficient because it also did not address a no-amend-ment alternative. Whether the EIR–EIS might have considered a no-amendment alternative depends on whether that alternative "would have been 'capable of avoiding or substantially lessening any significant effects of the project,' even if it 'would impede to some degree the attainment of the project objectives.'" *Watsonville Pilots Ass'n,* 183 Cal.App.4th at 1087, 108 Cal.Rptr.3d 577 (quoting Guidelines § 15126.6(b)). Plaintiffs argue that the no-amendment alternative would have "preserved existing land-use rules" and thereby "avoided impacts by preserving the environmental protections inherent in those rules." (Pls.' Reply at 14:18–19.) The court agrees with plaintiffs that defendants cannot dispute that removing the physical restrictions imposed by those rules would create effects on the physical environment. Indeed, defendants noted that if they had not built the Code amendments into the Project, a significant effect would have resulted. (AR 3926); *see also Citizens Ass'n for Sensible Dev. of Bishop Area v. Cnty. of Inyo,* 172 Cal.App.3d 151, 175, 217 Cal.Rptr. 893 (4th Dist.1985) ("It is true that a project would normally be considered to have a significant effect on the environment if it conflicts with the adopted environmental plans and goals of the community where it is located.").

Under CEQA, however, a court cannot require an agency to consider an alternative merely because plaintiffs can show that it is environmentally superior in certain aspects. Instead, the alternative must avoid or substantially limit a significant and unavoidable effect of the project. After mitigation, the Project's impacts are reduced to a less than significant level with four exceptions. These include impacts on traffic at two already congested locales and significant climate change impacts. (*See* AR 2705, 2708, 2726; *see also id.* at 8961–62 (third-party appeal to EIR–EIS certification).) Thus, plaintiffs' argument

that a no-amendment alternative should be considered because it preserves existing land-use rules fails because the Project has no significant and unavoidable effects related to land-use regulations.

A no-amendment alternative would necessarily be smaller than the Proposed project because only residential units could be built. But because any reduced-size project would still create additional traffic and generate greenhouse emissions, TRPA explained that the Project's unavoidable impacts are likely to remain substantial and unavoidable with any smaller alternative.[24] (*See id.* at 8961 ("Any alternative that would result in an incremental increase in traffic at Fanny Bridge would also result in significant and unavoidable impacts . . . ."), 8962 ("Any alternative that attains the basic objective of the Project, however, would also result in significant and unavoidable impacts with respect to cumulative climate change.").) Substantial evidence supports the conclusion that the no-amendment alternative would not avoid or substantially reduce the Project's unavoidable impacts. The court thus finds that the EIR–EIS's alternatives analysis is not inadequate because it did not consider a no-amendment alternative.

### 2. *Additional Reduced–Size Alternative*

■ As explained above, the range of alternatives considered in the EIR–EIS was reasonable. "When an EIR discusses a reasonable range of alternatives sufficient to foster informed decisionmaking, it is not required to discuss additional alternatives substantially similar to those discussed." *Cherry Valley Pass Acres & Neighbors v. City of Beaumont,* 190 Cal.

App.4th 316, 355, 118 Cal.Rptr.3d 182 (4th Dist.2010). An EIR's selection of alternatives should not become vulnerable when decision makers and the public can intelligently consider an alternative not discussed in the EIR by studying the alternatives that are. *See Vill. Laguna of Laguna Beach, Inc. v. Bd. of Supervisors,* 134 Cal.App.3d 1022, 1028, 185 Cal.Rptr. 41 (4th Dist.1982) (declining to hold that the agency should have considered another alternative between 10,000 and 20,000 units when the EIR evaluated plans for the development of 0, 7,500, 10,000, 20,000, and 25,000 dwelling units); *cf. Watsonville Pilots Ass'n,* 183 Cal.App.4th at 1090, 108 Cal.Rptr.3d 577 (requiring consideration of reduced alternative when the only comparable alternative was the no-project alternative, which did not serve the purpose that a reduced-development alternative should have served).

The EIR–EIS already considered one reduced-size alternative, Alternative 6. The environmental advantages of an even smaller alternative could be understood from the EIR–EIS's analysis of that alternative as impacts, such as the amount of emissions the alternative would produce, would be proportionally reduced. But plaintiffs also contend that the record indicates that the impacts of another reduced-size alternative could have been substantially less. As the court noted in its discussion of the no-amendment alternative, TRPA explained that any reduced variation of the Project would have the same unavoidable effects as the Project, although on an incrementally smaller scale. *See Mira Mar,* 119 Cal.App.4th at 491, 14 Cal.Rptr.3d 308 (declining to require city to consider additional alternative for

---

**24.** The court may consider the whole record in determining whether the range of alternatives is reasonable. *See Cal. Native Plant Soc.,* 177 Cal.App.4th at 987, 99 Cal.Rptr.3d 572 (holding that where complaint regarding alternatives analysis was that it was "merely perfunctory," court could review the whole record to assess the sufficiency of the range of alternatives in the EIR).

planned 96–unit condominium development when it would encounter the same environmental problems as those already analyzed). Plaintiffs have proffered no countervailing evidence that a reduced project, such their suggestion of one with a one-third reduction in units, would substantially reduce the Project's traffic and climate change impacts. *Cf. Mount Shasta Bioregional Ecology Ctr.,* 210 Cal.App.4th at 199, 148 Cal.Rptr.3d 195 ("[P]laintiffs make no attempt to show how such alternative ... would have reduced overall environmental impacts of the Project."); *Tracy First,* 177 Cal.App.4th at 929, 99 Cal.Rptr.3d 621 (noting that for project with significant air quality and traffic impacts, where there was no evidence in the record that fewer customers would patronize a smaller store, whether the smaller alternative would have less significant effects, and to what degree, was only speculation).

"CEQA does not require an EIR to consider 'each and every conceivable variation of the alternatives stated.' " *Mira Mar,* 119 Cal.App.4th at 491, 14 Cal. Rptr.3d 308 (quoting *Residents Ad Hoc Stadium Com. v. Bd. of Trustees,* 89 Cal. App.3d 274, 287, 152 Cal.Rptr. 585 (1979)). Consideration of one reduced-size alternative, in conjunction with the Project's other alternatives, "represent[ed] enough of a variation to allow informed decisionmaking." *Mann v. Community Redevelopment Agency,* 233 Cal.App.3d 1143, 1151, 285 Cal.Rptr. 9 (1991). Although the court recognizes that a smaller alternative was possibly not considered on the grounds of economic infeasibility, which it has found unsubstantiated, plaintiffs identify no cases, and the court finds none, that demand an additional reduced-size alternative to be considered when the range of alternatives is otherwise reasonable. Accordingly, the court finds that the EIR–EIS is not inadequate for declining to study an additional reduced-size alternative.

### B. *Economic Infeasibility*

1. *TRPA's and the County's Findings of Financial Infeasibility under CEQA*

■■■ Before an agency "may approve a project with a significant environmental impact, it is required to make findings identifying ... the [s]pecific ... considerations that make infeasible the environmentally superior alternatives ...." *Flanders Found. v. City of Carmel-by-the-Sea,* 202 Cal.App.4th 603, 620–21, 135 Cal.Rptr.3d 221 (6th Dist.2012) (alterations in original) (internal quotation marks omitted). The Guidelines define "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." Cal. Pub. Res. Code § 21061.1; *see also* Guidelines § 15126.6(f)(1) (stating that the "economic viability" of an alternative is a relevant consideration when evaluating the feasibility of an alternative). As to a project's economic feasibility, " '[t]he fact that an alternative may be more expensive or less profitable is not sufficient to show that the alternative is financially infeasible. What is required is evidence that the additional costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project.' " *Pres. Action Council v. City of San Jose,* 141 Cal. App.4th 1336, 1352, 46 Cal.Rptr.3d 902 (2006) (quoting *Goleta II,* 197 Cal.App.3d at 1181, 243 Cal.Rptr. 339).

The agency's feasibility findings must be "based on substantial evidence set forth anywhere 'in the record.' " *Goleta I,* 52 Cal.3d at 569, 276 Cal.Rptr. 410, 801 P.2d 1161 (quoting Cal. Pub. Res. Code § 21081.5); *see also* Guidelines

§ 15131(c).[25] Substantial evidence is not "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate ...." *Id.* § 15384. Although the agency may rely on expert opinion, it must be supported by facts. *Id.; see Bakersfield Citizens for Local Control v. City of Bakersfield*, 124 Cal.App.4th 1184, 1198, 22 Cal.Rptr.3d 203 (5th Dist.2004). The agency cannot simply rely on evidence proffered by the project's proponent regarding infeasibility; instead, the agency " 'must *independently* participate, review, analyze and discuss the alternatives in good faith.' " *Save Round Valley Alliance v. Cnty. of Inyo*, 157 Cal. App.4th 1437, 1460, 70 Cal.Rptr.3d 59 (4th Dist.2007) (quoting *Kings Cnty. Farm Bureau v. City of Hanford*, 221 Cal.App.3d 692, 708, 270 Cal.Rptr. 650 (5th Dist.1990)) (emphasis in original).

▮▮▮ Although a reviewing court should not decide whether studies are irrefutable or could have been better, it cannot " 'uncritically rely on every study or analysis presented by a project proponent in support of its position. A clearly inadequate or unsupported study is entitled to no judicial deference.' " *Berkeley Keep Jets Over the Bay Comm. v. Bd. of Port Comm'rs*, 91 Cal.App.4th 1344, 1355, 111 Cal.Rptr.2d 598 (2001) (*"Berkeley"*) (quoting *Laurel Heights*, 47 Cal.3d at 409, 253 Cal.Rptr. 426, 764 P.2d 278). However, "[t]echnical perfection is not required; [the court] looks not for an exhaustive analysis but for adequacy, completeness, and a good-faith effort at full disclosure." *Eureka Citizens for Responsible Gov't v. City of Eureka*, 147 Cal.App.4th 357, 371–72, 54 Cal.Rptr.3d 485 (1st Dist.2007). Here, TRPA and the County did not just rely on the financial documentation submitted by JMA to reach the determination that Alternative 6 or any other reduced alternative is financially infeasible.[26] They also considered economic analyses prepared by an independent third-party expert, BAE Urban Economics. BAE prepared an initial memorandum and, later, a follow-up memorandum after FOWS submitted a letter commenting on the initial analysis.[27] (AR 18968.)

BAE's initial memorandum considered the prospect of the ski operations achieving profitability over the long term with Alternative 6 (the "reduced project"), having 284 units (the proposed project has 336 units). (*Id.* at 40477.) It explained that the resort is currently operating at a loss and needs to invest about $10 million in capital improvements to two of its main ski

---

**25.** The Guidelines provide:

[E]conomic, social, and particularly housing factors shall be considered by public agencies together with technological and environmental factors in deciding whether changes in a project are feasible to reduce or avoid the significant effects on the environment identified in the EIR. If information on these factors is not contained in the EIR, the information must be added to the record in some other manner ....

Guidelines § 15131(c).

**26.** JMA submitted a "Homewood Sustainability Analysis," which stated that a twenty percent reduction in unit count would not be sufficient to justify investment in the Project. (AR 40112–13.)

**27.** The court declines to speculate as to the implications of the timing of TRPA and the County's receipt of Homewood's economic sustainability analysis and the BAE reports. There is "nothing in CEQA requiring an EIR to analyze issues of economic feasibility or requiring an agency to receive public input on the question of economic feasibility." *Sierra Club v. Cnty. of Napa*, 121 Cal.App.4th 1490, 1506, 19 Cal.Rptr.3d 1 (1st Dist.2004) The court's review is limited to whether there is substantial evidence in the record to support TRPA and the County's economic feasibility findings.

lifts in the near future. (*Id.* at 40478.) BAE states that Homewood's mid-week skier average is significantly lower than the industry average. (*Id.*) This is because the resort has no overnight accommodations, it is primarily considered a "day ski" area. (*Id.*) BAE states that Homewood's owners have designed the Project to increase revenues, and thus better cover the costs of operating the resort, by increasing the number of mid-week, non-holiday skiers. (*Id.* at 40479.) While the proposed project would potentially bring $823,284 per year in increased skier revenue, this profit is projected to decrease by $127,609 per year if the reduced project is implemented.[28] (*Id.* at 40483.) BAE later adjusted its estimate of the proposed project's skier revenues to be approximately $670,000. (*See id.* at 18971.)

The "analysis does not estimate the potential revenue gains from other related operations, such as ski rental, ski lessons, and resort dining facilities" because, "to the extent that these operations also represent an opportunity for the ski resort to increase its profitability, the reduction in potential skier days associated with the reduced project alternative would have a commensurate reduction in the potential revenue support that these operations could provide . . . ." (*Id.* at 40481.) It thus finds that "[a]ny reduction in resort lodging units from the [Project] will reduce the potential skier revenues and impair the resort's ability to achieve ongoing operational viability." (*Id.* at 40485.)

The analysis further explains, however, that even for the proposed project, increased skier visits alone will not be sufficient to generate a gross operating profit and justify the additional required major capital investments. (*Id.*) Thus, "it will be necessary for the ski resort to generate additional profits from other aspects of the project . . . including ski rental, lessons, and food service operations." (*Id.*) Each "income stream[ ] will be necessary to support resort viability and the reduced project alternative would only erode this ability." (*Id.*) Moreover, any version of the project will likely need to invest profits from the associated real estate development into supporting the ski resort's immediate capital investment needs. (*Id.*) BAE reports that the increase in skier revenues under the proposed project would attract $5.5 million in new capital investments and $4.6 million under the reduced project. (*Id.* at 40483.)

The second memorandum from BAE explains that "lift ticket sales represent 52 percent of total operating revenue" for resorts of Homewood's size. (*Id.* at 18968–69.) It rejects the suggestion "that a mechanism might be created whereby the adjacent real estate would provide an ongoing operating subsidy to the ski resort." (*Id.* at 18969.) Revenues from the real estate development are intended "to provide [a] cross-subsidization of the resort's one-time capital needs" and "once the real estate development is complete, there will not be a mechanism or source for ongoing subsidies from real estate development." (*Id.*) Moreover, such a mechanism is "not likely, because the project has not yet identified the full costs of required mitigations and/or exactions that could be imposed by regulating agencies." (*Id.*) BAE opines that it will likely be a challenge to meet the resort's capital needs with revenues from the real estate, let alone provide an ongoing subsidy for the ski resort. (*Id.*)

As to the potential for other departments at the Resort to generate additional

---

**28.** It calculated the estimated revenue increase based on the assumption that the accommodation units would average a fifty-five percent occupancy rate of 2.25 skiers and that Homewood would cap attendance on eight peak days. (*Id.* at 40481.)

revenue, BAE's second memoranda elaborates that although they create additional revenue, they also generate additional offsetting costs. (*Id.* at 18970.) Ultimately, BAE opined that:

> [T]he proposed project's bed base, less reductions in ticket revenues from capping peak day attendance, plus any minor increases in profits from other departments are designed to achieve profitability that will enable the resort to be sustainable over time. The reduced project alternative or (other smaller alternatives) would undermine this and would not likely generate sufficient additional operating revenues to address the operating losses.

(*Id.* at 18971.)

The BAE memoranda fail to provide substantial evidence that Alternative 6 is economically infeasible. At best, BAE's analyses show that a reduced-size alternative would be less profitable. Fatal to BAE's flawed conclusion of infeasibility is its failure to consider the Resort's other revenue streams besides lift tickets, to what extent the real estate component of the project could support the reduced project's economic feasibility, and whether the capital investment a reduced project could attract is sufficient.

First, the memoranda fail to provide a factual basis for the conclusion that the reduction in profits from ticket sales in the reduced project is so severe as to render "it impractical to proceed with the project." *Pres. Action Council,* 141 Cal. App.4th at 1352, 46 Cal.Rptr.3d 902. Although revenues from various other departments are cited as *critical* to the financial viability of the proposed project and comprise forty-eight percent of the resort's revenues, they are not given the same importance in the memoranda's review of Alternative 6. Indeed, BAE's analyses show that even the proposed project cannot make up the deficit at which it is currently operating on profits from additional lift tickets alone. BAE estimates the revenues from the proposed project's increased sale of lift tickets to be $670,000 per year; thus, the proposed project's other operations must produce at least $330,000 in profits just to prevent the Resort from losing money each year. BAE appears to assume that with the proposed project, the Resort's other operations can make up the deficit from increased lift ticket sales to ensure long-term profitability of the resort, but does not show that the reduced project cannot also do so.

The only explanation given for the different treatment of these revenues streams in BAE's analyses of the feasibility of the proposed project and the reduced project is that the latter's reduced ticket sales will result in less revenue from those other departments because fewer skiers will use the Resort's services and those departments carry offsetting costs.[29] But this distinction only shows lower profitability; it does not rise, without more, to a showing of infeasibility. BAE makes no attempt to estimate the potential revenue the Resort's other operations could provide under Alternative 6 or the proposed project and thus fails to provide evidence in this regard for its conclusion that Alternative 6 is economically infeasible while the proposed project is feasible.

Next, BAE asserts that revenue from sales of residential/lodging units is "necessary to support resort viability," but also that "the reduced project alternative would only erode this ability." (*Id.* at 40485.) If real estate income is necessary to the long-term economic feasibility of the proposed

---

**29.** Indeed, BAE's further explanation that marginal revenue increases in the other departments will also bring marginal increases in costs, undermines the profitability of both the proposed project and the reduced alternative.

project because it helps to meet immediate capital needs, it is also necessary to the reduced alternative's feasibility, even if the income from it is proportionally less. But BAE's analyses do not take the next step and show that the reduced project's reduction in profit is too much. Indeed, BAE's conclusion from this portion of its analysis begs the question: Is the lesser income from the reduced project's real estate sales insufficient to support the Resort's long-term feasibility?

The memoranda also fail to consider whether the real estate component could provide an ongoing subsidy for the resort, explaining that it is intended only to provide a one-time subsidy for the resort's capital costs and that mitigation costs are unknown. (*Id.* at 18969.) Despite JMA's intention that the real estate component only provide a one-time surge of capital, BAE explains that a mechanism to create an operating subsidy from that component "might be created," but this is not likely because of the unknown mitigation costs. However, the record shows that mitigation costs are fixed at $20–25 million, even if the units are reduced. (*Id.* at 9376.) Because BAE did not estimate the possible revenue from any such subsidy, another potential source of support for the economic feasibility of the reduced project went unconsidered.

Finally, BAE concluded that a smaller alternative's reduced profitability would decrease its ability to attract investment capital, which in turn would increase Homewood's difficulty in financing the necessary capital improvements. Even the proposed project, however, will not attract enough capital financing to completely fund the improvements. (*Id.* at 40478, 40483.) Furthermore, although BAE acknowledges that the developer can invest profits from the project's real estate development into supporting the ski resort's immediate capital investment needs, it does not indicate whether the sales from the reduced project's real estate component could make up the difference between the investment it would attract and the Resort's capital needs. Again, even though the reduced alternative will bring in less capital, BAE provides no facts to show that the lesser amount is not enough.

These flaws are exacerbated by the lack of relevant financial data. Except for listing what appears to be the average revenue for departments, excluding lift ticket sales, at ski resorts similar to Homewood in size, (*id.* at 18970), BAE never estimates the projected revenues for such departments at Homewood for either the proposed project or its reduced variation. Nor does it provide any data on the potential income from the real estate component of the project. In *Center for Biological Diversity v. County of San Bernardino*, 185 Cal.App.4th 866, 111 Cal.Rptr.3d 374 (2010), the EIR relied exclusively on a memorandum from an environmental consulting firm to establish the financial infeasibility of an enclosed composting facility as an alternative to an open-air facility. *Id.* at 876, 111 Cal.Rptr.3d 374. The memorandum based its estimate of costs for the proposed private composting facility only on the costs associated with the development of one public enclosed facility, even though there were other entities operating within the state, as well as nationally, which suggested that enclosed facilities might be economically feasible. *Id.* at 884, 111 Cal.Rptr.3d 374.

The court in that case noted various omissions in the report, including its assumptions that the costs of that one facility were reasonable and illustrative of the general costs of composting facilities, as well its failure to explain why the costs of the public project more than doubled from the initial estimate or why the project took longer to develop than anticipated. *Id.* Overall, the court found that the memoran-

dum lacked "meaningful comparative data pertaining to a range of economic issues." *Id.* It court held that substantial evidence did not support the final EIR's position that an enclosed facility was infeasible. *Id.* at 885, 111 Cal.Rptr.3d 374.[30]

This court does not question BAE's expertise or dispute the accuracy of the information it did rely on, but notes, like the court in *Center for Biological Diversity*, that significant gaps in BAE's memoranda information render meaningful comparison between the proposed project and the reduced alternative impossible. As explained above, while the information provided by JMA and BAE includes the projected profits from increased lift ticket sales, the BAE memoranda are bereft of projections of the profits that the Resort's other departments will contribute under either version of the project, although they do estimate the potential capital investment each would attract. Without such comparative data, the economic feasibility of the reduced alternative is un-

known beyond the obvious conclusion that it would be less profitable. *See Uphold Our Heritage v. Town of Woodside*, 147 Cal.App.4th 587, 599, 54 Cal.Rptr.3d 366 (2007) (finding conclusion that alternatives were financially infeasible was not supported by substantial evidence when EIR included cost of the proposed alternatives, which would restore the home, but not the cost of the proposed project, which would build a new home); *Goleta II*, 197 Cal.App.3d at 1172–74, 243 Cal.Rptr. 339 (invalidating the county's finding of economic infeasibility because the record contained no financial data, such as "estimated costs, projected income, or expenses" for reduced-size alternative). Accordingly, the County's finding that Alternative 6 is economically infeasible is not supported by substantial evidence.

## 2. *Adequacy of the EIR–EIS's Alternative 6 Analysis Under CEQA*

▉ Plaintiffs also contend that the EIR–EIS failed to adequately explain why

---

**30.** Defendants cite several cases for the proposition that courts have upheld agencies' findings on the economic infeasibility of alternatives. *See, e.g., Flanders Found.*, 202 Cal. App.4th at 619–623, 135 Cal.Rptr.3d 221; *Cherry Valley Pass Acres & Neighbors*, 190 Cal.App.4th at 353–55, 118 Cal.Rptr.3d 182; *San Franciscans Upholding the Downtown Plan v. City & Cnty. of S.F.*, 102 Cal.App.4th 656, 693–95, 125 Cal.Rptr.2d 745 (1st Dist. 2002); *City of Fremont v. S.F. Bay Area Rapid Transit Dist.*, 34 Cal.App.4th 1780, 1787–89, 41 Cal.Rptr.2d 157 (1st Dist.1995). The court does not dispute this proposition. More importantly, in none of these cases did the evidence of financial feasibility suffer from the same conclusory analysis or lack of key economic data as in the present case. In *Flanders Foundation*, plaintiffs critiqued an expert's report finding an alternative to restore and lease a City-owned property to be infeasible on the grounds that it: "d[id] not look at comparable park/mansion properties, City maintenance expenses, City budget and funding capabilities, nor the financial feasibility of any of the myriad potential quasi-public

uses suggested by the Flanders Foundation and others." 202 Cal.App.4th at 621, 135 Cal.Rptr.3d 221. However, there was an explanation for each of these omissions. The report's author looked for, but could not find, any comparable properties; the City would have to restore the property to lease it at a cost exceeding $1 million and therefore it could have reasonably concluded that spending any amount of maintenance expenses on the property was inappropriate; the City's budget and funding capabilities were not relevant because the feasibility determination depends on whether a reasonably prudent property owner would proceed with the alternative (such a person would not when there was significant benefit to restoring and selling the property); and there was no a viable lease market for any "quasi-public" use. *Id.* at 621–22. In contrast, there is no explanation for the omissions in BAE's memoranda identified above, especially because BAE itself has stressed the importance to the proposed project of revenue streams besides lift tickets.

the reduced-size alternative (Alternative 6) and any other smaller-scale alternative were rejected as economically infeasible, thereby precluding meaningful public participation. (Pls.' Reply at 17:18–19.) Plaintiffs explain that they are not claiming that CEQA requires a feasibility analysis to be included in the EIR–EIS. (Id.); see San Franciscans Upholding the Downtown Plan v. City & Cnty. of S.F., 102 Cal.App.4th 656, 690–91, 125 Cal.Rptr.2d 745 (1st Dist.2002) (CEQA does "not require the EIR itself to provide any evidence of the feasibility of . . . alternatives, much less an economic or cost analysis of the various project alternatives and mitigating measures identified by the EIR."). Indeed, CEQA requires only that "alternatives and the reasons they were rejected . . . be discussed in the EIR in sufficient detail to enable meaningful participation and criticism by the public." [31] *Laurel Heights*, 47 Cal.3d at 404, 253 Cal.Rptr. 426, 764 P.2d 278. The court here limits its discussion to the EIR–EIS's analysis of Alternative 6, given that it has found that the EIR–EIS did not need to consider an additional reduced-size alternative.

The EIR–EIS stated that the ski resort needs to increase mid-week ticket sales by an average of 400 in order to generate sustainable revenues and at minimum cover operating costs. (AR 2751.) It explained that although the resort generates sufficient weekend and holiday skier visits, it needs a minimum of 316 onsite tourist accommodation and residential units to generate the additional 400 ticket sales per day. (Id. (explaining the assumptions behind this calculation).) It then concluded that Alternative 6, with 282 planned units,

or any smaller alternative, would therefore be financially infeasible. (Id.)

Here, the EIR–EIS's failure to discuss whether Alternative 6's additional revenue streams would enable the ski resort to be financially viable in the future did not allow for "participation and criticism by the public." *Laurel Heights*, 47 Cal.3d at 404, 253 Cal.Rptr. 426, 764 P.2d 278. The EIR–EIS misleads the public by suggesting that ticket sales revenue is the only relevant factor in assessing the financial viability of Homewood, when in fact the BAE memoranda clearly show that other revenue streams are critical to the resort's financial viability. To be clear, the court is not requiring duplication of the financial analysis in the administrative record in the EIR–EIS. But to adequately explain the reasons it has rejected Alternative 6, the EIR–EIS must at least explain that Alternative 6's additional revenue streams and sources of capital—including the probable capital investments it could attract and profits from the real estate development—are insufficient to ensure its financial viability. Accordingly, the EIR–EIS's analysis of Alternative 6 is inadequate under CEQA.

### 3. EIR–EIS's Alternatives Analysis and TRPA's Infeasibility Finding under the Compact

The Compact requires consideration of alternatives to the proposed project. (Compact art. VII(a)(2)(C), (a)(3).) It also requires that TRPA make findings of infeasibility for a project's alternatives when the project has significant and unavoidable impacts. (Id. VII(d)(2).) Additionally, TRPA must "take account of and . . . seek

---

31. Plaintiffs also rely on the Guidelines, which require that the EIR "briefly explain the reasons" underlying an infeasibility determination. See Guidelines § 15126.6(c). This provision, however, applies only to alternatives that were rejected as infeasible during

the scoping process. Id. ("The EIR should also identify any alternatives that were considered by the lead agency but were rejected as infeasible during the scoping process and briefly explain the reasons underlying the lead agency's determination.").

to harmonize the needs of the region as a whole" in formulating and maintaining the Regional Plan. (*Id.* art. V(c).) Plaintiffs argue that the EIR–EIS failed to provide any meaningful analysis of the financial feasibility of Alternative 6, or any other alternative, and that this violated the Compact's mandate to consider the needs of the region as a whole. The court rejects plaintiffs' contention that TRPA's duty in this regard required it to include more detailed financial information in the EIR–EIS than required by CEQA. Instead, for the same reasons that the EIR–EIS's explanation for rejecting Alternative 6 was inadequate under CEQA, it is also inadequate under the Compact's requirement to consider alternatives to a project. Likewise, TRPA's finding that Alternative 6 is economically infeasible is not supported by substantial evidence.

In addition to analysis of alternatives to a project, the Compact requires an EIS to "[s]tudy, develop and describe appropriate alternatives to recommended courses of action for any project which involves unresolved conflicts concerning alternative uses of available resources." (*Id.* art. VII(a)(3).) Contrary to plaintiffs' assertions, the court finds this provision to have little bearing on the level of analysis that must be present in an EIS beyond an alternative's description. Instead, this provision appears to speak to the range of alternatives that must considered under specific circumstances.

## V. *Verification of Existing Land Coverage*

Plaintiffs argue that the EIR–EIS failed to adequately describe the amount of existing "land coverage" in the Project area. They view this flaw as contaminating various other elements of and conclusions in the EIR–EIS, including its ability to ensure that there is enough land coverage available to restore to allow for new hard coverage and to mitigate excess coverage

and its analysis of water quality impacts, as well as the adequacy of TRPA's findings that the Project complied with the coverage removal and restoration requirements prerequisite to approval of additional height under the CEP and Code section 22.4.G.

## A. *EIR–EIS's Description of Existing Soft Coverage*

██ The Code governs new developments' need for the creation of new coverage of land. Among other things, it sets limits on the maximum percentage of a parcel of land that may be covered ("allowable base coverage"), Code §§ 20.3.A., 20.3.B, and the manner and conditions under which coverage may be either "transferred" between parcels, *id.* §§ 20.3.B, 20.3.C., or "relocated" within a project area, *id.* § 20.5.C. The Code uses a direct offset method; to put it simply, for each square foot of coverage created in one place, a square foot of coverage must be removed from another. (*See* RP at II–12.) The Code also has a land banking program, in which land coverage that has been removed from a parcel "may be credited to the parcel account, if such coverage or units is verified by TRPA as legally existing on or after October 15, 1986." Code § 38.2.C. "Existing" is defined in the Code as "[l]egally present or approved on the effective date of the Regional Plan or subsequently legally constructed, commenced or approved pursuant to necessary permits." *Id.*

Land coverage to be used on the site for restoration purposes and the resultant land coverage that will result from the Project comes from verified existing land coverage retained in its current location or relocated from within the Project area in accordance with Code section 20.5.C. (*See* AR 3966). Relocation is permitted for existing land coverage on the same parcel or

project area. *Id.* § 20.4.C. For the relocation of coverage, there must be restoration "to cause the area to function in a natural state with provisions for permanent protection from further disturbance." *Id.* § 20.4.C; *see id.* § 20.5.C(2).

The Code defines "land coverage" as:

1) A man-made structure, improvement or covering, either created before February 10, 1972 or created after February 10, 1972 pursuant to either TRPA Ordinance No. 4, as amended, or other TRPA approval that prevents normal precipitation from directly reaching the surface of the land underlying the structure, improvement or covering . . .; and

2) lands so used before February 10, 1972, for such uses as for the parking of cars and heavy and repeated pedestrian traffic that the soil is compacted so as to prevent substantial infiltration.

*Id.* § 2.2. The two types of coverage are referred to as "hard coverage" and "soft coverage," respectively. *Id.* Examples of hard coverage include roofs, decks, surfaces covered with asphalt or concrete, roads, and parking lots. *Id.* Hard coverage does not include structures, improvements, or coverings "that permit[ ] at least 75 percent of normal precipitation directly to reach the ground and permit[ ] growth of vegetation . . . ." *Id.*

Plaintiffs argue that for land to qualify as "soft coverage" two requirements must be met: (1) it must have been in use before February 10, 1972, for such uses as parking cars or heavy pedestrian traffic, and (2) the soil must be compacted so as to prevent substantial infiltration. In their view, the latter requirement means that the land *presently* prevents substantial infiltration. In other words, the coverage must be permanent. Plaintiffs base this interpretation on the definition's use of the present tense ("the soil is compacted") and

how soft coverage is categorized in the Code and Regional Plan as a "permanent land disturbance." *See* Code § 20.4 ("No additional land coverage or other permanent land disturbance shall be permitted in [certain areas]."); (RP at IV–15, IV–25 ("No new land coverage or other permanent disturbance shall be permitted in [certain areas].")). In contradistinction to soft coverage, under the Code a "land disturbance" is a broader category of land, which may include permanent disturbances, but also more ephemeral or only temporary disturbances. *See* Code § 2.2 (defining "land disturbance" as "[d]isruption of land that includes alteration of soil, vegetation, surface hydrology, or subsurface hydrology on a temporary or permanent basis"); *see also id.* § 20.4.C (noting that land that has been disturbed and or consists of hard or soft coverage may be eligible for credit for restoration).

Defendants initially appeared to approach the issue from a different angle. They suggested in their briefs that present infiltration rates are not relevant to whether soft coverage legally "exists" on a parcel. (Defs.' Reply at 28:8–9 (Docket No. 58).) Instead, the verification process requires that TRPA determine whether land coverage existed at the time the Regional Plan was adopted. *See* Code § 38.2.C ("Land coverage and units of use may be credited to the parcel account, if such coverage or units is verified by TRPA as legally existing on or after October 15, 1986."); *id.* § 2.2 (defining "existing" as "[l]egally present or approved on the effective date of the Regional Plan or subsequently legally constructed, commenced or approved pursuant to necessary permits").[32] This approach is necessarily predicated on an interpretation of soft coverage that reads the second prong of the definition ("the soil is compacted") as a

---

**32.** The Regional Plan was adopted in 1987.

requirement only at the time of creation. In other words, soft coverage "exists" if at some point up to 1972, soil became compacted in such a manner as to prevent substantial infiltration, regardless of whether that soil is still compacted today. In defining soft coverage this way, defendants appeared to adopt a view of the Regional Plan's land coverage scheme that envisioned that the status quo in 1972 (or by 1986, after which the Plan was finally adopted) would be the baseline from which decisions about development would be made. Allowable land coverage would never exceed what existed at that time.

At oral argument, however, counsel for TRPA stated that *present* infiltration rates are relevant to determining whether soft coverage exists. The court therefore concludes that for land to be soft coverage, it: (1) must have been in use before February 10, 1972, for such uses as parking cars or heavy pedestrian traffic, and (2) the soil must be presently compacted so as to prevent substantial infiltration. *See Bassiri v. Xerox Corp.,* 463 F.3d 927, 930 (9th Cir.2006) ("[W]here an agency interprets its own regulation, even if through an informal process, its interpretation of an ambiguous regulation is controlling under *Auer* unless 'plainly erroneous or inconsistent with the regulation.'" (quoting *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997))).

Plaintiffs dispute the propriety of how TRPA verifies soft coverage, arguing that it uses no actual measurements or any other objective criteria to verify that soil prevents substantial infiltration before it is restored. They rely on the Code's definition of "hard coverage" to inform what would constitute "substantial infiltration" and argue that some of the roads TRPA verified as soft coverage did not prevent substantial infiltration because before restoration they allowed for rates of infiltration of fifty-six and seventy-five percent.

(Pls.' Mem. at 33:26.) Moreover, many of the verified roads supported vegetation, likewise indicating that they are not coverage. (*Id.* at 34:2–3.) Plaintiffs also state that infiltration rates on certain roads did not appreciably increase following restoration. (*Id.* at 34:11–15.) They note TRPA's reliance on aerial photos and maps showing that unpaved roads existed in 1972 ignores the definitional requirement that the land currently prevent substantial infiltration to be soft coverage. They conclude accordingly that substantial evidence does not support that much of the verified soft coverage is existing coverage and could be validly banked.

Defendants respond that the Code does not define "substantial infiltration" and that the court should defer to its chosen methodology for determining whether land presently prevents substantial infiltration, rather than requiring the quantitative system preferred by plaintiffs. TRPA has already verified 1,781,447 square feet of coverage on the Homewood Property, (AR 3452), of which 1,473,060 square feet is soft coverage, (*id.* at 3485). The majority of the soft coverage verified consists of dirt roads. *Id.* TRPA argues that its determination that dirt roadways are generally sufficiently compact to be "soft coverage" is based on substantial evidence and should not be disturbed.

The court will uphold TRPA's determinations of soft coverage if they are rational and supported by substantial evidence. Compact VI(j)(5); Cal. Pub. Res. Code § 21168.5. The court's "duty is not to pass on the validity of the conclusions expressed in the EIR, but only on the sufficiency of the report as an informative document." *Eureka Citizens for Responsible Gov't,* 147 Cal.App.4th at 372, 54 Cal. Rptr.3d 485; *cf. Native Ecosystems Council v. Weldon,* 697 F.3d 1043, 1051 (9th Cir.2012) ("A court generally must be at

its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." (internal quotation marks and citation omitted)).

To determine soft coverage on the Homewood property, TRPA compared existing dirt roads to a 1969 U.S. Forest Service aerial photograph, made field measurements, and visited the sites of particular road segments. (*See* AR 3966–68 (explaining the verification and banking process).) TRPA adopted dirt roads as a proxy for soft coverage because "years of TRPA's staff experience, with the concurrence of other expert agencies, has taught that the compaction of these bare dirt surface[s] leads to substantial sediment runoff as a result of failing to infiltrate and thereby eroding the road surface." (Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem.") at 51:8–12 (Docket No. 47–1).) And because dirt roads are generally permanent in nature due to the compaction and erosion associated with such features, they also indicate that substantial infiltration is not presently occurring. (*See* Defs.' Reply at 28:13 n. 14.) Thus, this methodology allowed TRPA to ensure that verified land was both in use by 1972 as a road and is presently compacted so as to prevent substantial infiltration.

As additional evidence to support this methodology, defendants cite to various sources in the record explaining that disturbed and compacted land, including dirt roads, should be restored because they result in soil loss and surface runoff that affects the water quality of Lake Tahoe. (*See id.* at 51:8–25; *see, e.g.,* AR 3520; TAR 4413, 10051–53). Defendants note that other expert agencies agree with TRPA that disturbed areas, including roads, should be restored. (*Id.* at 5951, 5954.) TRPA's consultant, Integrated Environmental Restoration Services, which assisted HMR with restoration projects, verified that unpaved roads at Homewood "are generally characterized by highly compacted soil conditions, low to no surface cover, and elevated runoff and sediment rates." (AR 3526.) This evidence is also relied on by TRPA to support its conclusion that dirt roads are generally permanent.[33] (*See* Defs.' Reply at 28:13 n. 14.)

The court finds that substantial evidence supports TRPA's use of dirt roads as a proxy for "soft coverage."[34] TRPA's interpretation of the Code requires TRPA to choose a method to verify that coverage existed in 1972 and presently prevents substantial infiltration. Presented with this difficult task, TRPA reasonably

---

**33.** Defendants explain that, "[b]ecause TRPA did not create a full inventory of land coverage when the Regional Plan was adopted, it must use an alternative method to determine if coverage existed at that time." (Defs.' Reply at 26:12–13; *see also* AR 4019 ("Infiltration measurements taken prior to restoration work do not represent infiltration measurements taken during land coverage verifications and clearly do not represent infiltration rates present on February 10, 1972 or at the time of the Regional Plan Adoption in 1987.").) This argument is only applicable if soft coverage need not presently prevent substantial infiltration. TRPA rejected this interpretation of soft coverage, however, at oral argument. Thus, it does not help TRPA to

show that its methodology to determine soft coverage is supported by substantial evidence.

**34.** Relatedly, plaintiffs argue that the EIR–EIS improperly deferred responses to their comments that specific road segments were not properly identified as coverage. (*See* Pls.' Mem. at 34:1 n. 18.) Because TRPA's method of determining soft coverage is supported by substantial evidence, the court does not find that TRPA's decision to respond to inquiries about particular road segments until the banking application and approval process precluded the public from being adequately informed about the accuracy of TRPA's coverage determinations. (*See* AR 4019.)

adopted the assumption, based on substantial evidence, that a dirt road in existence by 1972 continues to prevent substantial infiltration. Plaintiffs may prefer a methodology that takes a more quantitative approach to determining "substantial infiltration" but TRPA's method is reasonably adapted to determine whether land meets the two prongs of the soft coverage definition. *Cf. The Lands Council v. McNair,* 537 F.3d 981, 1000 (9th Cir.2008) (" 'When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.' " (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989))). TRPA's chosen methodology may not result in perfection, but it is not the court's role to mandate so much. Accordingly, the court finds that the EIR–EIS's determination of the amount of existing soft coverage in the Project area is supported by substantial evidence.

### B. Use of TRPA's Soft Coverage Determinations in the EIR–EIS

Plaintiffs contend that TRPA's method of determining soft coverage resulted in an unreliable verification of total soft coverage and banked coverage. As a result, the EIR–EIS does not adequately support the conclusion that sufficient restoration credits exist to offset the Project's extensive new coverage. And to the extent that the Project's new coverage is not offset by the restoration of actual existing land coverage, the Project will have unexamined and unmitigated significant impacts on soil and water resources in violation of CEQA and the Compact.

As to the Project's soil impacts, Plaintiffs argue that "the unreliable soft coverage numbers" undermine the EIR–EIS's conclusion that the Project's existing excess coverage can be mitigated to a less than significant level, as required by TRPA's Excess Land Coverage Mitigation Program.[35] (Pls.' Reply at 30:10–19.) Because TRPA's soft coverage determinations are supported by substantial evidence, this argument must be rejected. Accordingly, the EIR–EIS accurately disclosed the Project's impacts on soil. Likewise, substantial evidence supports the EIR–EIS's conclusion that the Project's significant soil impacts will be mitigated to a less than significant level.

As to the Project's water quality analysis, even if defendants are incorrect and the amount of verified coverage impacts the water quality analysis because that analysis relies on a computer model with a "dirt road" input, TRPA's soft coverage determinations are supported by substantial evidence, and plaintiffs' argument must be rejected. Accordingly, the EIR–EIS accurately disclosed the Project's impacts on water quality. For the same reason, the EIR–EIS's finding that soft-coverage restoration efforts will improve infiltration is supported by substantial evidence.

### C. Validity of TRPA's CEP and Additional Height Findings

In addition to offsetting its creation of new coverage, the Project needs to restore existing land coverage to mitigate excess existing coverage over the allowable base land coverage limits, as required by the Excess Land Coverage Mitigation Program. (AR 3486.) To mitigate this existing coverage, it will permanently retire 174,373 square feet of coverage. (*Id.* at

---

**35.** Defendants argue that plaintiffs did not raise any arguments regarding the EIR–EIS's conclusions on soil impacts during the administrative process. (Defs.' Mem. at 50 n. 10.) Regardless, the court rejects the argument as without merit above.

3496.) It also needs to restore "substantial coverage" for its participation in the CEP and to permanently retire at least ten percent of the Project area's coverage to obtain additional height pursuant to Code section 22.4.G(1)(b). (*Id.* at 7299; TAR 639.) The latter provision requires retirement of 176,134 square feet. (AR 3496.)

Plaintiffs argue that TRPA's unsupported soft coverage determinations undermine the EIR–EIS's conclusion that there is sufficient coverage available within the Project area to restore and bank to meet the requirements of the CEP and Code section 22.4.G(1)(b). Relatedly, plaintiffs argue that TRPA cannot rely on the same retired square feet of coverage to fulfill the CEP requirements and to mitigate the existing excess coverage at the site and obtain additional height. Similarly, they argue that the Project cannot rely on the same retired square feet to both mitigate the existing excess coverage at the site and meet the requirements of Code section 22.4.G(1)(b).

The first argument must be rejected because the court has already found that TRPA's determination of soft coverage is supported by substantial evidence. As to the second argument, to participate in CEP, projects must provide "substantial environmental benefits or mitigation in excess of TRPA's project mitigation requirements." Code § 33.3.D(3). For the Project, CEP required "substantial land coverage reduction." (AR 7299.)

Although the Project will arguably not permanently retire substantially more coverage than it is required to retire to mitigate existing excess land coverage, it does permanently retire enough coverage to produce "substantial land coverage reduc-

tion." (*See* AR 7299 (explaining that Project will retire at least thirteen percent of total existing land coverage).) The Project also provides numerous environmental benefits beyond those which it is legally required to provide and so even if it restored no coverage beyond that which is otherwise required, it could still meet the requirements to participate in the CEP program. *See* Code § 33.3; (TAR 766).[36] The court therefore need not decide whether the same coverage may be counted for the purposes of obtaining additional height and mitigating excess coverage, as well as meeting the CEP requirements.

Finally, Code section 22.4.G(1)(b) requires that "[e]xisting verified land coverage otherwise permissible within the Ski Area Master Plan pursuant to the Regional Plan shall be reduced by a minimum of 10 percent and permanently retired ...." Plaintiffs argue that coverage permanently retired under the Excess Land Coverage Mitigation Program is not "otherwise permissible" because it must be removed for the Project to proceed. Thus, the coverage removed for that purpose cannot be counted as the coverage retired for additional height. Plaintiffs failed to exhaust this argument. Although the amendment was not in effect until Project approval, it was part of the Project and the Project was intended to meet any requirements it might impose. Plaintiffs had an opportunity to raise this issue during the environmental review process and failed to do so. Moreover, exhaustion is apropos because there is a dispute over the interpretation of an agency's regulation and the agency should be given an initial opportunity to interpret that regulation.

---

**36.** The record also shows that even without the ten percent of existing coverage that must be permanently restored to obtain extra height (and the slightly smaller amount to mitigate existing coverage), that coverage is only part of the 500,000 square feet in total that the Project plans to restore. (AR 7299.)

Accordingly, TRPA's findings that the Project is consistent with CEP, the Excess Land Coverage Mitigation Program, and Code section 22.4.G's requirements are supported by substantial evidence.

## VI. *The EIR–EIS's Air Quality Analysis*

### A. *Adequacy of Mitigation Measure for Air Quality Impacts*

The EIR–EIS concluded that the Project will have significant air quality impacts from increased VMT.[37] (AR 3360.) During the winter ski season, the existing VMT is higher than the VMT estimated with the proposed project because "the residential units and hotels rooms would result in internalization between Project uses, reducing the external trips generated as compared to existing conditions." (*Id.* at 3361.) During the summer, however, the VMT will increase from 0 VMT to an estimated 8,431 VMT. (*Id.*) The EIR–EIS also concluded that the Project, considered jointly with other planned projects in the region, will have significant cumulative long-term air quality impacts from both increased VMT and emissions from area and stationary sources. (*Id.* at 3386.)

To mitigate these air quality impacts to a less than significant level, the Project proposes to make contributions to the Traffic and Air Quality Mitigation Fund ("Mitigation Program") under Chapter 93 of the Code. (*Id.* at 3378, 3386.) TRPA adopted the Mitigation Program to generate sufficient revenue to address air quality impacts associated with VMT. (*Id.* at 3378.) The fund is "used for activities that reduce VMT or otherwise reduce air pollutant emissions from automobiles." (*Id.* at 3960.) The EIR–EIS explains that "[b]y contributing to TRPA's Mitigation Pro-

gram, the Project effectively mitigates air quality emissions through VMT reductions achieved through [the] Mitigation Program, as VMT reductions typically result in reductions of air pollutant emissions." (*Id.* at 3378.)

As the EIR–EIS explains, TRPA tracks the Mitigation Program's funds and disburses them at the request of the local jurisdiction from which they are collected, or the Tahoe Transportation District, if "the expenditure is consistent with TRPA's Regional Transportation Plan or the 1992 Air Quality Plan." (*Id.* at 3960.) The EIR–EIS states that strategies that may be funded by the Mitigation Program to mitigate the Project's air quality effects could include: "[e]xpansion of existing transit facilities; [a]ddition of bicycle lanes; Transportation Systems Management measures such as bicycle facilities, pedestrian facilities, and use of alternative fuels in fleet vehicles; and [p]rovision of connectivity between multi-use paths for bicycles and pedestrians." (*Id.* at 3378.) Chapter 93 provides a fee schedule that sets varying fees per vehicle trip, depending on the project. *See* Code § 93.3.D.

### 1. *CEQA*

Plaintiffs first challenge the EIR–EIS's study of mitigation measures under CEQA. A brief restatement of the appropriate standard of review is first in order. Under CEQA, the court must determine whether TRPA and the County prejudicially abused their discretion either by not proceeding in the manner required by law or by making a decision not supported by substantial evidence. Cal. Pub. Res. Code § 21168.5; *Laurel Heights*, 47 Cal.3d at

---

**37.** The EIR–EIS also determined that although stationary source emissions from the Project will not generate emissions in excess of the significance threshold, there is a possibility that the future use of wood-burning appliances would generate substantial emissions. (AR 3377.) The EIR–EIS finds this to be a significant impact and provides another mitigation measure to reduce it to a less than significant level. (*Id.*)

392, 253 Cal.Rptr. 426, 764 P.2d 278. It "presume[s] the correctness of the agency's decision and the petitioners thus bear the burden of proving that the EIR is legally inadequate or that the record does not contain substantial evidence to support the agency's decision." *Save our Peninsula Comm. v. Monterey Cnty. Bd. of Supervisors*, 87 Cal.App.4th 99, 139, 104 Cal. Rptr.2d 326 (6th Dist.2001). Plaintiffs here challenge the adequacy of the EIR–EIS's discussion of Mitigation Measure AQ–2a for the Project's air quality impacts, requiring the court to consider whether TRPA and the County failed to proceed in a manner prescribed by CEQA. *Vineyard Area Citizens*, 40 Cal.4th at 435, 53 Cal.Rptr.3d 821, 150 P.3d 709 (question of the sufficiency of CEQA as an informational document is one of law). They also challenge the County's findings that the Project's significant air quality effects will be reduced to less than significant, requiring the court to consider whether the County's conclusion is supported by substantial evidence.

If the EIR is the heart of CEQA, then mitigation is its teeth. *Envtl. Council of Sacramento v. City of Sacramento*, 142 Cal.App.4th 1018, 1039, 48 Cal.Rptr.3d 544 (3d Dist.2006). CEQA requires that an EIR set forth the ways in which a project's significant effects on the environment can be mitigated by proposing mitigation measures that will minimize those effects. Cal. Pub. Res. Code § 21100(b)(3); *see also id.* §§ 21002.1(a), 21061. The EIR should identify mitigation measures that "could reasonably be expected to reduce adverse impacts if required as conditions of approving the project." Guidelines § 15126.4(a)(1)(A); *Laurel Heights*, 47 Cal.3d 376 at 416–17, 253 Cal.Rptr. 426, 764 P.2d 278. Mitigation measures must be feasible—capable of being successfully accomplished in a reasonable amount of time, considering economic, environmental, social, and technological factors—and enforceable. Guidelines § 15126.4(a)(1)-(2); Cal. Pub. Res. Code § 21061.1. They must also be " 'roughly proportional' to the impacts of the project." Guidelines § 15126.4(a)(4)(B).

Fee-based mitigation programs have been found to be adequate mitigation measures under CEQA. *See, e.g., City of Marina v. Bd. of Trs. of the Cal. State Univ.*, 39 Cal.4th 341, 364, 46 Cal.Rptr.3d 355, 138 P.3d 692 (2006); *Save our Peninsula Comm.*, 87 Cal.App.4th at 141, 104 Cal.Rptr.2d 326; *Napa Citizens for Honest Gov't v. Cnty. of Napa*, 91 Cal.App.4th 342, 363, 110 Cal.Rptr.2d 579 (1st Dist. 2001) ("Fee-based infrastructure can be an adequate mitigation measure under CEQA."). The CEQA Guidelines specify that such programs are appropriate when the project funds its "fair share" of a mitigation measure designed to alleviate a cumulative impact. Guidelines § 15130(a)(3). Plaintiffs do not dispute that the Project could rely on a fee-based mitigation program to reduce its significant air quality impacts. They argue instead that the EIR–EIS's mitigation analysis is inadequate under CEQA because it fails to show *how* the Program will offset air quality impacts. Relatedly, they argue that the EIR–EIS improperly deferred the formulation of mitigation measures.

If the EIR–EIS's analysis of the mitigation measure is to be upheld, it must be upheld on the basis articulated in that document. *League*, 739 F.Supp.2d at 1271. Defendants argue that even if the EIR–EIS's analysis is inadequate, they did not need to find that the Project's air quality impacts would be significant. (Defs.' Mem. at 62.) After the final EIR–EIS was completed, defendants asked their consultants to produce supplemental analyses of the Project's vehicle miles traveled ("VMT"). (*See* TAR 6587–95 (ICF Memorandum), 6596–99 (Fehr and Peers Memorandum).) VMT is defined as "[t]he

total miles traveled by a motorized vehicle, or a number of motorized vehicles, within a specific area or during a specified period of time." (RP at B–5.) The supplemental studies showed that based on the Project's reduction of VMTs associated with the transfer and retirement of TAUs and "Equivalent Residential Units," the EIR–EIS significantly overstated the Project's air quality impacts and that the Project would not result in an annual increase in VMTs in the basin. (AR 9006; TAR 9132.)

Additional documentation in the record, however, "does not make up for the lack of analysis in the EIR." *Save our Peninsula Comm.*, 87 Cal.App.4th at 130, 104 Cal. Rptr.2d 326. Agencies thwart the informational purposes of CEQA when they attempt to alter the conclusions in the EIR after its finalization. The adequacy of the EIR–EIS will therefore be considered on the grounds provided therein.

▮ A fee-based mitigation program is sufficient under CEQA if there is evidence that mitigation will actually occur. *Save our Peninsula Comm.*, 87 Cal.App.4th at 140, 104 Cal.Rptr.2d 326. It follows that simply promising to contribute funds to a fee-based mitigation program is not a sufficient mitigation measure if the program will not actually provide mitigation. *See id.* at 140, 104 Cal.Rptr.2d 326 ("Of course a commitment to pay fees without any evidence that mitigation will actually occur is inadequate."). The EIR under review in *Communities for a Better Environment v. City of Richmond*, 184 Cal.App.4th 70, 108 Cal.Rptr.3d 478 (1st Dist.2010) ("CBE"), did not set forth any particular mitigation measure for the proposed project's greenhouse gas emissions, but instead required the project proponent to hire an independent expert to create a mitigation plan that considered measures suggested in the EIR, which would be approved by the City after the environmental review process.

*Id.* at 92, 108 Cal.Rptr.3d 478. The court faulted the EIR for failing to set any standards for successful mitigation and not attempting any calculations as to the reductions the "vaguely described future mitigation measures" would produce. *Id.*

In contrast to the nascent plan for mitigation in *CBE,* the Mitigation Program is an established program with well-developed guidelines. While not all of the specific projects funded by the Mitigation Program have undergone environmental review, TRPA created the program specifically "to offset impacts from indirect sources of air pollution," Code § 93.0, and the Mitigation Program itself underwent environmental review when it was adopted as part of the Regional Plan, (AR 13820; Defs.' Mem. at 66:23 n. 20). The EIR–EIS does not specify which particular projects will be funded, it only lists a few possible projects that the mitigation fee could support. It does, however, explain that the Mitigation Program must expend its funds in compliance with TRPA's 1992 Air Quality Plan or Regional Transportation Plan ("RTP"). (AR 3960.) The Air Quality Plan consists largely of measures implemented by TRPA to attain and maintain air quality standards in the Region, such as Code section 91.7's limitations on idling. (*See* TAR 8961–8963 (explaining the elements of the Air Quality Plan).) The RTP has the primary objective of attaining and maintaining the Compact's thresholds by creating a program "to research, plan, and coordinate potential mitigation activities . . . ." (*Id.* at 8612; *see id.* at 8590–664 (Lake Tahoe Regional Transportation Plan).)

While not in the body of the EIR–EIS, the RTP is referenced therein and is in the record. It explains in exhaustive detail the mobility-related projects that the Mitigation Program provides funding for as part of an overall effort to attain the thresholds. (*See id.*) Just two examples

of the thirty-six planned projects include the U.S. 50 Pedestrian and Bicycle Improvements Project and specific measures to attract and retain transit users for the publically operated transit center. (*Id.* at 8627, 8633, 8642). The RTP also includes the cost estimates, project objectives, and anticipated completion dates for all the projects. (*Id.* at 8624.) In *CBE*, the court recognized that because there was no set mitigation measure, more detailed analysis was required for the EIR to adequately show that mitigation would occur. Here, the Mitigation Program has funded and will continue to fund carefully developed projects; there is no doubt that mitigation will occur.

Nor is payment to the Mitigation Program improper deferral. In *CBE,* the court found improper deferral in the EIR where "there was no assurance that the plan for how the [p]roject's greenhouse gas emissions would be mitigated to a net-zero standard was both feasible and efficacious, and [it] created no objective criteria for measuring success." 184 Cal.App.4th at 95, 108 Cal.Rptr.3d 478. In contrast, the Project has committed to mitigation: it will pay the appropriate fee under Chapter 93 to the Mitigation Program, which is already in place and driven by the comprehensive RTP. It is especially appropriate here for the Project to contribute to the Mitigation Program because VMT-related emissions are a regional pollutant and must be combated on a regional basis. In contrast to the failure to develop a plan for mitigation at the time of the EIR's production in CBE, the EIR–EIS here has clearly not "plac[ed] the onus of mitigation to [a] future plan and [left] the public 'in the dark about what land management steps will be taken, or what specific criteria or

performance standard will be met.'" *Id.* at 93, 108 Cal.Rptr.3d 478 (quoting *San Joaquin Raptor Rescue Ctr. v. Cnty. of Merced,* 149 Cal.App.4th 645, 670, 57 Cal. Rptr.3d 663 (5th Dist.2007)).

The EIR–EIS does not provide analytical data showing that mitigation will occur, which was noted as a deficiency in *CBE*. Mathematical precision is not needed in this case, however, to inform the public and decision makers that mitigation will occur. Unlike the unformed and incomplete measures at issue in that case, "we must presume and expect that the [agency] will comply with its own ordinances, and spend the fees it collects on the appropriate improvements ...." *Save our Peninsula Comm.,* 87 Cal.App.4th at 141, 104 Cal.Rptr.2d 326. In lieu of such numbers, assurance that the Project is contributing enough to mitigate its share of air quality impacts in the region is provided by the fact that the fee it must pay is determined by the amount of VMTs it will contribute. *See* Code § 93.3.D.

The Mitigation Program's fee is set to ensure that there is sufficient funding for its air quality mitigation projects. *Id.* § 93.6 (requiring TRPA to make a biennial review of the fee schedule in light of the costs of needed improvements and the funds available to support those improvements); *cf.* Guidelines § 15130(a)(3) ("A project's contribution is less than cumulatively considerable if the project is required to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact."). Although defendants should have provided in the EIR–EIS how the fee is calculated, as well as the actual fee it must pay, this error is not prejudicial.[38] *See* Cal. Pub. Res. Code § 21005.

---

**38.** Plaintiffs argue on reply that because the mitigation fee will be based on the peak summer increase in vehicle daily trips *minus* the reduction in winter vehicle daily trips, instead

of the peak summer increase, payment to the Mitigation Fund will not assure that the peak summer increase in VMT and resulting cumu-

Furthermore, it would make no sense to require what is tantamount to *de novo* environmental review of an established fee-based mitigation program each time such a program is used as a mitigation measure. The Mitigation Program is part of an important collective effort at addressing a problem that cannot be ameliorated with piecemeal efforts. (A bus stop at Homewood is useless in encouraging visitors and residents to use public transportation if there are not bus stops throughout the Region.) It helps to fund the RTP, which not only encompasses carefully developed long-term and on-going strategies to reduce dependence on private automobile travel, but also has prioritized six regionally significant projects that in many cases have had preliminary planning, public review, and environmental documentation. (TAR 8624.) Plaintiffs complain that the RTP sets no specific targets or performance measures for emissions or vehicle trip reductions. (Pls.' Reply at 38:8–11.) However, the RTP is intended to help achieve the thresholds, which do provide such standards. (*See* TAR 8612.)

A mitigation fund loses its effectiveness if each time a project intends to contribute to it as a mitigation measure it faces a collateral attack demanding that all the research and planning behind it be reproduced. The Mitigation Program and the RTP are briefly discussed in the EIR–EIS

and the details of both are in the record and publically available. (*See* AR 3960 (explaining that expenditure of funds from Mitigation Program must be consistent with RTP).) For an established program adopted specifically to address air quality in the Region, that is adequate, even where analytical data is not provided in the EIR–EIS itself.

Finally, in *Save Our Peninsula*, the EIR contained a comprehensive traffic analysis that identified problem areas on two roads and recommended mitigation in the form of fees paid to a traffic impact fee program established by county ordinance and designed to implement road improvements as needed. 87 Cal.App.4th at 139, 104 Cal. Rptr.2d 326. Planned improvements included "intersection channelization and passing lanes," as well as twelve proposed interim projects based on a county-adopted "Deficiency Plan." *Id.* at 141, 104 Cal.Rptr.2d 326. Petitioners argued "that the EIR failed as an informational document because it failed to tie the fee mitigation plan to the actual physical impacts of the project on the environment ... [and] claimed the EIR mitigation plan must identify the nature of specific improvements and their timing and how the improvements would mitigate the impact of the increased traffic." *Id.* at 137–38, 104 Cal.Rptr.2d 326.[39] The court rejected these arguments, explaining: "All that is required by CEQA is that there be a reasonable plan for mitigation." *Id.* at 141, 104 Cal.Rptr.2d 326.[40]

---

lative ozone impacts are adequately mitigated. (Pls.' Reply at 39:7–10.) Defendants counter that the argument has not been exhausted, but the court finds it has no merit. Calculation of fees is set by the Mitigation Program, not the Project. Moreover, as explained above, the fee schedule is updated biennially to ensure that the program has sufficient funds in light of the costs of needed improvements. Code § 93.6.

**39.** Plaintiffs attempt to distinguish this case on the grounds that it was concerned with whether implementation would occur in a

timely matter. Although the court did address this concern, it also clearly addressed the substantive adequacy of the payment of fees as a mitigation measure.

**40.** For the development project in *Endangered Habitats League v. County of Orange*, 131 Cal. App.4th 777, 32 Cal.Rptr.3d 177 (4th Dist. 2005), to reduce its impact on traffic on a specific road to a less than significant level, it planned to contribute to two existing fee programs to fund road improvements. *Id.* at 784, 32 Cal.Rptr.3d 177. The court disapproved of contribution to these programs as a

Plaintiffs attempt to distinguish *Save Our Peninsula* and other cases approving fee-based mitigation programs on the grounds that the contributed funds were to be applied to specifically defined projects that were described in the EIR.[41] *See, e.g., City of Marina,* 39 Cal.4th at 363–64, 46 Cal.Rptr.3d 355, 138 P.3d 692; *Envtl. Council of Sacramento,* 142 Cal.App.4th at 1039, 48 Cal.Rptr.3d 544; *Save Our Peninsula,* 87 Cal.App.4th at 140–41, 104 Cal. Rptr.2d 326. As explained above, however, the EIR–EIS incorporates by reference the RTP and its detailed analysis of the specific projects that the Mitigation Program will fund. Moreover, none of the courts in those cases held that fee-based mitigation is inadequate unless the EIR specifically identifies which projects the fees will fund. Although more detail could have been provided in the body of the EIR–EIS, it adequately, if imperfectly, informed the public that mitigation would occur.

The EIR–EIS states that to mitigate the Project's air quality impacts, JMA must pay the required fee based on its predicted VMTs to the Mitigation Program, which has and will continue to implement specified projects that are designed to reduce VMT or otherwise reduce air pollutant emissions from automobiles. This is a "reasonable plan for mitigation." *Save Our Peninsula,* 87 Cal.App.4th at 141, 104 Cal.Rptr.2d 326. Accordingly, the court

finds that the EIR–EIS's discussion of air quality mitigation measures was adequate under CEQA and that the County's findings that the Project's air quality impacts will be reduced to a less than significant level are supported by substantial evidence.

### 2. Compact

■ The Compact requires an EIS to include "[m]itigation measures which must be implemented to assure meeting the standards of the region." (Compact art. VII(a)(2)(D).) TRPA must also make written findings that "[c]hanges or alterations have been required in or incorporated into [the] project which avoid or reduce the significant adverse environmental effects to a less than significant level." (*Id.* art. VII(d)(1).) In *League,* TRPA proposed two programs, the "Blue Boating Program" and a buoy fee program, to mitigate the air and water quality impacts of increased motorized boating that would result from TRPA's approval of the construction of new boating facilities on Lake Tahoe. 739 F.Supp.2d at 1279–80. Addressing the plaintiffs' challenge that the EIS's discussion of mitigation was inadequate, the court observed that the EIS did not discuss the potential efficacy of any of the Blue Boating Program's elements and gave scant, if any, analytical data thereon; failed to discuss the types of projects that would be funded by the sticker fees aspect

mitigation measure because there was neither evidence of the specific improvements that would be funded by the programs nor evidence that the mitigated project would achieve the required service level. *Id.* at 785, 32 Cal.Rptr.3d 177. However, any persuasive value of the case is minimal given that the issue before the court was whether the project complied with the City's general plan, not whether the EIR's discussion of the mitigation measure was sufficient under CEQA. Defendants' reliance on friends of *Lagoon Valley v. City of Vacaville,* 154 Cal.App.4th 807, 65 Cal.Rptr.3d 251 (1st Dist.2007), is unpersua-

sive for the same reason. *See id.* at 817, 65 Cal.Rptr.3d 251 (appellant arguing that project was inconsistent with City's general and policy plans).

**41.** Plaintiffs also cite *Napa Citizens for Honest Government* for the proposition that mitigation funds must be applied to specifically defined projects described in the EIR. In that case, however, the EIR rejected payment to a relevant mitigation fund as an infeasible mitigation measure. 91 Cal.App.4th at 363, 110 Cal.Rptr.2d 579.

of the Blue Boating Program; and did not reveal whether there would be sufficient funding to pay for the needed mitigation. *Id.* at 1283. It disapproved the buoy fee program analysis for failing to discuss the aggregate amount by which it would cause emissions to be reduced. *Id.*

The court relied on NEPA caselaw to explain what constitutes a sufficient discussion of a mitigation measure under the Compact. *Id.* at 1282. The court found this to be proper because both the Compact and NEPA have comparable provisions requiring a statement of the unavoidable environmental impacts of a project.[42] *Id.* at 1281–82. It also relied on the Compact's requirement that, when mitigation is feasible, TRPA must make " 'written findings' that 'changes or alterations' will 'avoid or reduce' environmental harm to insignificance, and these findings 'must be supported by substantial evidence,' " *id.* at 1281 (quoting Compact art. VII(d)(1)), to hold that the EIS must include "at a minimum, a 'reasonably complete' discussion of mitigation measures including 'analytical data' regarding whether the available measures would achieve the required result," *id.*

Two caveats must accompany the *League* court's articulation of what constitutes an adequate discussion of mitigation measures under the Compact. First, while NEPA caselaw may provide persuasive authority for interpreting the Compact, it is not controlling. Under NEPA, the duty to study possible mitigation measures stems from the statute's requirement that the unavoidable adverse effects of a project be studied. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351–52, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (holding that an EIS must con-

sider the extent to which adverse effects can be avoided by discussing possible mitigation measures). Under the Compact, an EIS needs to include "[m]itigation measures, which must be implemented to assure meeting standards of the region." (Compact art. VII(a)(1)(D).) Thus, while NEPA focuses on mitigation measures that ameliorate a project's adverse impacts, the Compact focuses on measures that achieve the Region's standards. The *League* court's wholesale adoption of NEPA caselaw fails to acknowledge this difference in what each law requires of a mitigation measure and the effect those particular requirements may in turn have on how a measure is analyzed in an EIS. *Cf. Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency,* 365 F.Supp.2d 1146, 1156 (D.Nev. 2005) ("NEPA is only persuasive authority for interpreting Article VII of the Compact ....."); *Comm. for Reasonable Regulation of Lake Tahoe,* 311 F.Supp.2d at 992 ("[I]t is unclear whether the standards for preparing an EIS under the NEPA apply to TRPA's interpretation of the Compact and its Code.").

Second, *League*'s reliance on TRPA's required findings is misguided. Those findings are made by TRPA *after* the EIS is completed, on the record as a whole. While they require substantial evidence in the record that any mitigation measure will reduce a significant impact to a less than significant level, they do not dictate what must be in the EIS specifically. Given the *League* court's unsteady reliance on NEPA caselaw and a Compact provision regarding findings made on the record, the court considers the case to have lesser persuasive value as to what the Compact

---

**42.** NEPA requires a statement of "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii). The Com-

pact requires the EIS to identify "[a]ny significant adverse environmental effects which cannot be avoided should the project be implemented." (Compact art. VII(a)(2)(B).)

requires in an EIS's analysis of a mitigation measure.

*League* is also distinguishable from the present case on the same grounds as *CBE*. The Blue Boating Program and buoy fees were measures newly conceived for mitigating the anticipated water and air quality effects from TRPA's approval of the construction of new boating facilities on Lake Tahoe. *League*, 739 F.Supp.2d at 1279. In the case of the Blue Boating Program, the EIS admitted that the program was incompletely developed. *Id.* For its sticker fee component, for example, "TRPA ha[d] not identified any discussion in the record . . . of particular potential mitigation efforts" that the collected funds would be use for. *Id.* at 1279–80. Although the EIS included some discussion of how the buoy fees would be spent, it did not explain by how much the program would reduce aggregate emissions. *Id.* at 1283. For these new and untested programs, the court necessarily required detailed analysis—including analytical data—as to how they would "suffice to offset the air and water quality impacts of increased boating." *Id.* at 1284. As explained above, however, the Mitigation Program is already part of the Regional Plan and encompasses the RTP's significant planning efforts. In this specific case, the details provided in the EIR–EIS, and the information referenced therein, are sufficient to show decision makers and the public that mitigation will occur. Additionally, JMA's payment of the mitigation fee addresses the Compact's requirement that mitigation measures maintain the region's standards because the RTP is designed to achieve and maintain the thresholds. (*See* TAR 8612.)

Accordingly, the court finds that the EIR–EIS's discussion of air quality mitigation measures was adequate under the Compact. TRPA's findings that the Project's air quality impacts will be mitigated to an insignificant level and its mitigation measure will assure meeting the standards of the region are supported by substantial evidence.

### B. *Validity of TRPA's Air Quality Threshold Findings*

Whenever TRPA amends the Regional Plan, it must find "that the Regional Plan, as amended, achieves and maintains the thresholds." Code § 6.4. Likewise, when it amends the Code, it must find that "the Regional Plan, and all of its elements, as implemented through the Code, Rules, and other TRPA plans and programs, as amended, achieves and maintains the thresholds." Code § 6.5. In *League*, TRPA had "concluded that this obligation [under Code § 6.5] was satisfied because the project included mitigation measures that would ensure that the [Code] Amendments had no significant adverse effects." *Id.* at 1268. The court explained, however, that for thresholds not in attainment, more is required: "a showing that something—whether the Amendments or something else—will provide the necessary improvement." *League*, 739 F.Supp.2d at 1271. As the *League* court explained:

Where a threshold is not in attainment, a finding that the problem is not getting worse does not satisfy this provision. Nor is it sufficient to find that, metaphorically, the ball is moving forward. By requiring that the Regional Plan be implemented so as to "achieve," rather than merely "approach," the thresholds, the Compact and Ordinances require a finding that TRPA will make it to the goal. TRPA is correct that Code section 6.5 looks to the entire package of the regional plan, ordinances, etc., rather than to effects specifically attributable to the proposed amendment. Thus, it does not matter whether the proposal at issue will make the scoring shot, or even whether it will be involved in the play.

The key is the finding that, one way or another, the thresholds will be achieved. *Id.* at 1269. In other words, "[s]ection 6.5 does not require a finding that thresholds have been achieved, it requires a finding that the amended ordinances implement the plan in a way that achieves them." *Id.* at 1270. The court agrees with plaintiffs that this holding applies equally to Code § 6.4 and defendants do not appear to dispute this.

 TRPA concluded that the Regional Plan, as amended, achieves and maintains the thresholds. (TAR 684.) It based its findings on the analyses of numerous reports and documents, including the EIR–EIS and the 2006 Threshold Evaluation Report ("Report").[43] (*See id.*) TRPA specifically identified the Environmental Improvement Program ("EIP") as a critical component of maintaining and achieving the thresholds, as it has funded over 700 projects and programs designed to help meet the thresholds.[44] (*Id.* at 685.) TRPA next identified the compliance measures in place, as well proposed supplemental measures, which are described in the Report and are intended to promote attainment. (*Id.* at 686.) Examples of the compliance measures include shuttle programs, bikeways, and intercity bus services. (*Id.* at 7096.) Also important to its finding is the CEP, which encourages projects having substantial environmental benefits that will further achievement of the thresholds. (*Id.* at 687.) Finally, TRPA noted that the new Regional Plan amendments will allow the Project to proceed, and the Project itself will help attain multiple thresholds. (*Id.*)

With respect to the ozone threshold, TRPA found that as of the Report, the threshold was not in attainment. (*Id.* at 688.) The Report indicates that the proposed target date for compliance is 2015. (*Id.* at 678.) It notes that ozone precursor emissions from the Project will not affect TRPA's efforts to attain the ozone threshold because the Project's operational-related emissions of NOx and ROG will not exceed the significance threshold for these pollutants. (*Id.* at 690.) With respect to the VMT threshold, TRPA found that as of the 2006 Report, the threshold was not in attainment, but that there has been a positive trend towards attainment. (*Id.* at 693.) It explained that the VMTs produced by the Project will be effectively mitigated through funds paid to the Mitigation Program. (*Id.* at 694.) It also referenced two analyses completed after publication of the final EIR–EIS demonstrating that the Project will actually not result in a net increase in VMTs.[45] (*Id.* at 694–95; *see also id.* at 6587–95 ("ICF Memorandum"), 6596–99 ("Fehr and Peers Memorandum").) Because ozone is affected by VMT levels, the impact from air pollutant emissions on ozone levels are

---

43. The Report is the result of TRPA's mandate to conduct a comprehensive evaluation every five years of whether each threshold is being achieved and/or maintained and to make specific recommendations to address problem areas. (TAR 6616.)

44. TRPA's findings explain that it joined with 50 public and private organizations to help achieve the environmental thresholds. (TAR 685.) Over $1 billion has been invested in the program. (*Id.*)

45. Plaintiffs challenge TRPA's reliance on these analyses to change the conclusions made in the EIR–EIS about the Project's impacts. (Pls.' Mem. at 41 n. 23.) They also contest the study's conclusions. (Pls.' Reply at 34:14 n. 26.) The Compact, however, does not limit TRPA to relying on the EIR–EIS to support its findings. TRPA expressly stated that its threshold findings were based on the analyses in the record and the court will therefore consider these analyses in determining whether there is substantial evidence for TRPA's findings. *See League,* 739 F.Supp.2d at 1281.

likewise overstated in the EIR–EIS. (*Id.* at 692.)

Plaintiffs argue that TRPA's findings lack evidentiary support. First they argue that neither VMT nor the ozone precursors emissions will be adequately mitigated. They next object to TRPA's failure to address the effectiveness of the compliance measures and programs and note that it is unclear whether the supplemental measures are adopted and enforceable. Finally, they suggest that any progress in attainment does not show that the Plan and Code will achieve and maintain the thresholds, and that regardless of any progress, TRPA must show that it has an "effective plan" in place to achieve each threshold.

The court does not read *League* as broadly as plaintiffs. *League* does not require TRPA to develop a specific plan and prove that it will be effective in meeting the thresholds. Rather, TRPA must conclude, based on substantial evidence, that it "has adopted a course of action that will meet the targets." *See id.* at 1271. Here, substantial evidence supports TRPA's conclusion that the combination of the various recommendations in the Report, the compliance measures, the EIP, the CEP, and the Plan amendments is such a course. Even though TRPA has not quantified the effects of each contributing element, it has explained how each will assist with achieving and maintaining the thresholds. TRPA has no doubt exceeded the showing, found inadequate in *League*, that the Plan as amended will not make things worse. *League*, 739 F.Supp.2d at 1269. It has gone further and made findings that the Plan and its related elements will make progress to and eventually attain the thresholds.

Nor do plaintiffs' objections undermine this conclusion. As the court found above, VMT and cumulative ozone impacts will be adequately mitigated through the Mitigation Program. Thus, the Project will not deter attainment of the air quality thresholds. This is also confirmed by the supplemental report acknowledging that the EIR–EIS overstated the Project's VMT effects. Although the supplemental compliance measures and programs appear not be mandatory, they are only part of the numerous programs that TRPA has identified as helping it to achieve and maintain the thresholds. Again, TRPA also relies on the EIP, the CEP, and the Regional Plan amendments as part of its course of action to ensure that the Regional Plan is implemented in a way that achieves and maintains the thresholds. Accordingly, the court finds that substantial evidence supports TRPA's findings that the Regional Plan and all of its elements will achieve and maintain the air quality thresholds.

## VII. *Noise Impacts*

### A. *Adequacy of the EIR–EIS's Analysis of Construction Noise Impacts*

#### 1. *CEQA*

Under CEQA, an EIR must identify the "significant environmental effects" of a proposed project. Cal. Pub. Res. Code § 21100(b)(1); Guidelines § 5126(a). A "significant effect" is "a substantial, or potentially substantial, adverse change in the environment." Cal. Pub. Res. Code § 21068. "[A] lead agency has the discretion to determine whether to classify an impact described in an EIR as 'significant,' depending on the nature of the area affected." *Mira Mar Mobile Cmty.*, 119 Cal. App.4th at 493, 14 Cal.Rptr.3d 308. That determination "calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." Guidelines § 15064(b).

To determine whether an impact is significant, an agency may rely on a "threshold of significance." Guidelines § 15064.7(a). Such a threshold can be "an identifiable quantitative, qualitative or per-

formance level of a particular environmental effect." *Id.* § 15064.7(a). Thresholds may be drawn from existing environmental standards, such as other statutes or regulations. *Protect The Historic Amador Waterways v. Amador Water Agency*, 116 Cal.App.4th 1099, 1107, 11 Cal.Rptr.3d 104 (3d Dist.2004). If the threshold is met, "the effect will normally be determined to be significant." Guidelines § 15064.7(a).

██ However, "[c]ompliance with the law is not enough to support a finding of no significant impact under the CEQA." *CATS*, 136 Cal.App.4th at 17, 38 Cal. Rptr.3d 638. The EIR's discussion of impacts must "provide[ ] sufficient information and analysis to allow the public to discern the basis for the agency's impact findings. Thus the EIR should set forth specific data, as needed to meaningfully assess whether the proposed activities would result in significant impacts." *Id.* at 13, 38 Cal.Rptr.3d 638 (internal citations omitted).

██ Placer County's noise ordinance establishes a daytime (7:00 AM to 10:00 PM) noise limit of 55 dBA, Leq, and a nighttime (10:00 PM to 7:00 AM) noise limit of 45 dBA, Leq. (AR 3963.) Construction noise, however, is exempt from the daytime limit between the hours of 6 AM and 8 PM Monday to Friday and between 8 AM and 8 PM on the weekend. (*Id.*) TRPA likewise exempts noise from construction activities between the hours of 8:00 AM and 6:30 PM. (*Id.*) The EIR–EIS adopted the County's and TRPA's noise ordinances as thresholds to determine if the noise impacts associated with the Project's construction will result in a significant impact. (*Id.* at 3411–12.)

The EIR–EIS determined that the noise impacts from the Project's daytime construction activities were not significant "[b]ecause of Placer County and TRPA's construction noise exemptions during daytime activities." (*Id.* at 3963.) However,

because nighttime construction activities could exceed the County's noise ordinance, the EIR–EIS found a significant impact and required mitigation measures to reduce construction noise to a less than significant level. (*Id.*)

Plaintiffs argue that by using the construction exemption as a threshold, TRPA and the County did not meaningfully consider the noise impacts of the project because it was a foregone conclusion that they would not result in a significant impact. As a result, plaintiffs argue that substantial evidence does not support the County's finding that the Project's noise impacts are less than significant. This contention, however, is difficult to square with the extensive analysis conducted in the EIR–EIS related to the Project's level of daytime noise. The EIR–EIS examined the noise impacts of the Project's construction activity based on the "worst-case scenario" in which the three loudest pieces of equipment would be operating at the same time. Under that scenario, noise levels would likely reach 93 dBA, Leq, at 50 feet. (*Id.* at 3411.) For the closest residences, 100 feet from the Project, noise from the construction activities for the Project could reach up to 85 dBA, Leq, and if pile drivers are used noise could reach up to 93 dBA, Leq, at those residences, without taking into account acoustical shielding or terrain. (*Id.* at 3413.) The EIR–EIS indicated that construction would occur seasonally between May 2011 and December 2020 and would occur at particular locations for only a fraction of the time. (*Id.* at 3411.)

As part of its analysis, the EIR–EIS considered that the impacts would be lessened by the noise reduction measures imposed by the County's ordinance, as well as the mitigation measure proposed because of the possibility that the construction noise would exceed the County's nighttime restrictions. The County's noise

ordinance requires that all construction equipment be fitted with factory-installed muffling devices and be maintained in good working order. (*See id.* at 8972 (explaining that for the Project's construction noise to be exempt from daytime noise level requirements, HMR must comply the ordinance's requirements); *id.* at 2820 (requiring regulatory compliance measures, including shrouding or shielding of impact tools and muffling or shielding intake and exhaust ports on construction equipment).)

Mitigation Measure NOI–1C provides that JMA "shall design and implement measures to reduce noise construction." (AR 3415.) JMA must prepare a noise control plan to identify measures that can be employed to reduce construction noise. (*Id.*) The plan must include "enclosing or shielding noise-generating equipment and locating equipment as far as practical from sensitive uses." (*Id.*) The plan must be implemented in a way to ensure that construction noises will not exceed 45 or 55 dBA, Leq, during sensitive hours on both weekdays and weekends. (*Id.*) Finally, TRPA and the County must approve the plan prior to issuance of a grading permit. (*Id.*)

Although there is no requirement in Mitigation Measure NOI–1C that construction noise be reduced to any particular level during the day, the measures and noise control plan it requires are not limited to nighttime construction. By its plain terms, JMA is required to "implement measures to reduce noise from construction." (*Id.*) There is no limitation on this imperative or any suggestion that it would apply only to nighttime construction. While the plan must ensure that construction noise does not exceed the thresholds at night, this standard does not limit the general command of the mitigation measure to reduce construction noise at all hours.

In *Berkeley*, the court reviewed challenges to an EIR for an expansion of the Oakland airport. 91 Cal.App.4th at 1350, 111 Cal.Rptr.2d 598. To determine whether the project would have a significant effect on noise, the EIR relied exclusively on a fixed standard of 65 CNEL. *Id.* at 1373, 111 Cal.Rptr.2d 598. CNEL, or "community noise equivalent levels," measures background noise levels based on a weighted average of all measured noise over a twenty-four-hour period. *Id.* In commenting on the draft EIS, citizens complained and several experts opined that its reliance on the CNEL metric caused it to ignore "single-event" nighttime noise and to fail to acknowledge citizens' sleep disturbances that such noise might cause. *Id.* at 1375–76, 111 Cal. Rptr.2d 598. The court explained that use of the CNEL standard precluded "any meaningful analysis of existing ambient noise levels, the number of additional nighttime flights that will occur under the [project], the frequency of those flights, to what degree single overflights will create noise levels over and above the existing ambient noise level at a given location, and the community reaction to aircraft noise, including sleep disturbance." *Id.* at 1382, 111 Cal.Rptr.2d 598. Given this oversight, the court held that the potential noise impact of increased nighttime flights required further study. *Id.*

It may fairly be said that TRPA and the County used a static, bright-line rule, like the CNEL standard in *Berkeley*, as the significance threshold for daytime construction noise (the exemption). But, unlike in *Berkeley*, that reliance did not preclude analysis of the potential impacts of the Project's construction noise. The analysis in the EIR–EIS is thorough and carefully details the level of noise that will result from the project.[46] Nor did the use

---

**46.** Each PAS sets "CNELs which shall not be

exceeded by any activity or combination of

of the exemption as a threshold preclude consideration of the particular setting in which the noise will occur. The EIR–EIS accounts for the particular setting of the Project, explaining the "noise sensitive land uses" that could be affected. (*Id.* at 3397.) It describes the effects noise increases have on humans, (*id.* at 3392–95), and details the noise levels at all times of day, not just during non-exempt hours, (*id.* at 3411.) It also explains the impact the construction noise will have on residential homes. (*See id.* at 3412.) Given this analysis, the EIR–EIS "sets forth sufficient information to foster informed public participation and enable the decision makers to consider the environmental factors necessary to make a reasoned decision." *Berkeley,* 91 Cal.App.4th at 1356, 111 Cal. Rptr.2d 598.

Plaintiffs reliance on *CATS* is unavailing for similar reasons. In that case, the agency proposed a statewide pesticide application program to control a pest threatening California's grapevines. *CATS,* 136 Cal. App.4th at 5, 38 Cal.Rptr.3d 638. The court held that in finding no significant impact based solely on the registration of the pesticides to be used and the related regulatory program in place, including safety regulations for employees handling pesticides, the EIR failed to adequately analyze the possible environmental effects of the specific uses of pesticides in the program, especially as related to the particular chemicals to be used, the amounts and frequency of their use, and specific sensitive areas targeted for application. *Id.* at 15–16, 38 Cal.Rptr.3d 638. The court faulted the agency for "repeatedly deferr[ing] to the [pesticide] regulatory scheme instead of analyzing environmental consequences of pesticide use and therefore [falling] short of its duty under CEQA

to meaningfully consider the issues raised by the proposed project." *Id.* at 16, 38 Cal.Rptr.3d 638.

Unlike the agency's failure in *CATS* to conduct independent analysis, TRPA and the County here did not rely on the ordinance to exclude all examination of the Project's noise effects; in fact, the EIR–EIS contains an extensive analysis, as detailed above. Moreover, the ordinances TRPA and the County adopted as a significance threshold would have contemplated regulating exactly the kind of noise that this project would produce: that from construction in a residential area. In contrast, the breadth and scope of the pesticide application in *CATS* involved the use of pesticides in a manner beyond that which the existing pesticide regulations took into account. *See id.* at 17, 38 Cal. Rptr.3d 638 (explaining that the state pesticide regulation program was not "intended to[ ] address the environmental impacts of administering a statewide pesticide application program backed by the full force of the DFA and the county agricultural commissioners").

As a final matter, the court notes that this case is unique among those cited by both parties in that the threshold selected by TRPA and the County includes an exemption. Plaintiffs argue that such a standard foreordains a finding of no significant impact and therefore precludes consideration of the Project's noise impacts, even though it may allow for disclosure of these impacts.

"In exercising its discretion [to determine if an impact is significant], a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting."

activities." Code § 23.3. The court addresses plaintiffs' argument regarding the EIR–EIS's failure to evaluate whether the Project's construction noise would violate the noise threshold standards for the adjacent PASs in subsection C, *infra.* (*See* Pls.' Mem. at 46:16–22.)

*Mira Mar*, 119 Cal.App.4th at 493, 14 Cal. Rptr.3d 308 (citing Guidelines § 15064(b)); *see also Nat'l Parks & Conservation Ass'n v. Cnty. of Riverside*, 71 Cal.App.4th 1341, 1359, 84 Cal.Rptr.2d 563 (1999) ("[T]he standards for assessing impacts of a project require careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data; these standards allow for a finding of an insignificant degree of impact, not necessarily a zero impact."). In *Mira Mar*, the court deferred to the City's discretion to determine that, while blocking public views would be a significant impact, the hindrance of private views would not be considered as such. 119 Cal.App.4th at 493, 14 Cal.Rptr.3d 308. These distinct significance thresholds for public and private views resulted because the City had adopted the its land-use policy, which embodied the distinctions. *Id.* at 494, 14 Cal. Rptr.3d 308.

As with the City's land-use policy, the noise ordinances embody a reasonable policy determination, here with respect to regulating noise. *See also Nat'l Parks & Conservation Ass'n*, 71 Cal.App.4th at 1358, 84 Cal.Rptr.2d 563 (upholding agency's choice to use residential noise standards in parkland). The exemptions in both ordinances are coupled with specific noise limits for evening hours. This two-part approach to noise regulation appears to reflect the conclusion that while it is crucial to have quantitative limitations on noise occurring during nighttime hours, construction noise occurring during daytime hours, even in a residential locale, is intermittent and temporary and thus not so disruptive as to give rise to a need for specific limits on it.[47] As did the City in *Mira Mar*, TRPA and the County appropriately exercised their discretion to use

the noise ordinances, and the policy choice they encompass, to determine whether the Project's construction noise would result in a significant effect. Further reason to believe that the noise ordinances are an appropriate significance threshold stems from the fact that daytime construction noise is only exempt if the various requirements of the County's noise ordinance, such as the use of muffling, are met.

Plaintiffs press that ultimately an exemption from regulation is no standard at all and would allow for unlimited construction noise. While a theoretical possibility, that is not the case before the court. The EIR–EIS did not attempt to evade consideration of the noise impacts from daytime construction, but instead clearly detailed those impacts and the factors that will limit them. Accordingly, the court finds that the EIR–EIS properly fulfilled its obligation under CEQA to analyze the environmental impacts of the Project's construction noise and therefore substantial evidence supports the County's findings that the Project's noise impacts are less than significant.

### 2. *Compact*

*League* again relied on NEPA caselaw to describe whether an EIS's analysis of a potential impact is sufficient under the Compact. It stated that "[t]he court must ask whether the EIS took a 'hard look' at [a project's] potential impacts." *League*, 739 F.Supp.2d at 1289 (quoting *Robertson*, 490 U.S. at 352, 109 S.Ct. 1835). Assuming the Compact requires such a "hard look," the court does not consider this standard to require different or more analysis than that required by CEQA. Thus, for the same reasons that the EIR–EIS's analysis of the Project's construction noise

---

**47.** Construction noise would not occur in the entire Project area for nine continuous years, as plaintiffs suggest. (AR 3411.) Instead, construction at each base will only occur for five years; new construction is expected to take two years. (*Id.* at 4308, 5025.)

impacts was sufficient under CEQA, it is also sufficient under the Compact. Likewise, TRPA's finding that the Project's construction noise impacts are less than significant is supported by substantial evidence.

B. *Adequacy of the EIR–EIS's Analysis of the Proposed Expanded Snowmaking System's Noise Impacts*

1. *CEQA*

"The fundamental purpose of an EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment.'" *Vineyard Area Citizens,* 40 Cal.4th at 428, 53 Cal.Rptr.3d 821, 150 P.3d 709 (quoting Guidelines § 21061). As noted previously, CEQA requires that an EIR adequately identify and analyze the significant environmental effects of the proposed project. Cal. Pub. Res. Code § 21100; Guidelines § 15126(a). This requirement extends to any future expansion or other action if it is a reasonably foreseeable consequence of the initial project and will likely change the environmental effects of the initial project. *Laurel Heights,* 47 Cal.3d at 396, 253 Cal.Rptr. 426, 764 P.2d 278.

"CEQA requires a lead agency to prepare an EIR for a project 'at the earliest possible stage,' yet, at the same time, it recognizes 'additional EIRs might be required for later phases of the project.'" *Cal. Oak Found.,* 188 Cal.App.4th at 271, 115 Cal.Rptr.3d 631 (quoting *City of Carmel–By–The–Sea v. Bd. of Supervisors,* 183 Cal.App.3d 229, 250, 227 Cal.Rptr. 899 (6th Dist.1986)). CEQA therefore permits a lead agency to use "tiering," which refers to the "coverage of general matters and environmental effects in an [EIR] prepared for a policy, plan, program or ordinance followed by narrower or site-specific [EIRs] which ... concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior [EIR]." Cal. Pub. Res. Code § 21068.5. In other words, it allows "the environmental analysis for long-term, multipart projects to be 'tiered,' so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved." *Vineyard Area Citizens,* 40 Cal.4th at 429, 53 Cal.Rptr.3d 821, 150 P.3d 709.

The EIR–EIS explains that JMA proposes to expand Homewood's snowmaking system from the current 23.8 acres of ski trails to a total of 102.3 acres, (AR 2773), and from ten snow guns to fifty-five.[48] (*Id.* at 3426, 3673.) A plan for the expanded system was submitted with the Project, although it did not indicate where the snow guns would be located. (*Id.* at 35899–913.) TRPA and the County have approved the Ski Area Master Plan, of which expanded snowmaking is a part. (*See id.* at 2773 ("The existing snowmaking system will be upgraded to ensure adequate early and late season snowpack.").) They have not approved, however, a specific snowmaking expansion plan and any expansion cannot go forward without further approval from TRPA and the County. (*Id.* at 8236 (conditional use permit approved by the County); TAR 2197–2199 (permit granted by TRPA).)

 The EIR–EIS explains that "[b]ecause the number and type of guns as well as the location of each gun is currently

---

**48.** Counsel for JMA repeatedly asserted at oral argument that Homewood currently uses twenty-one snowguns. The record counsels otherwise: Homewood has *"five* guns operating at the north side and [*five* ] guns operating at the south side ...." (AR 3426 (emphasis added).)

unknown, the noise levels from snowmaking cannot be quantified."[49] (AR 3426.) Instead, it describes the "worst-case scenario," in which the snowmaking system would operate every night of the ski season from midnight until 7:00 AM and for three continuous days for two weeks at the beginning of the season. (*Id.*) It then quantifies the noise created by three different guns used in Homewood's current snowmaking system at three different locations. (*Id.* at 3409–10 (identifying noise levels for the currently used snowmaking equipment).) The EIR–EIS concludes that because "[s]nowmaking currently exceeds noise standards at the residential uses near the North and South Base areas" that "new snowmaking activities that result in an increase in snowmaking noise would result in a significant noise impact." (*Id.* at 3964.)

The mitigation measure adopted in the EIR–EIS to reduce existing and proposed snowmaking noise levels to a less than significant level requires JMA to reduce noise levels at Homewood to meet adjacent PAS CNEL limits. (*Id.* at 3428.) JMA must "prepare a noise control plan to design, construct/install, and operate new snowmaking equipment so that the increase in noise associated with snowmaking conditions ... is reduced to meet the appropriate PAS limit." (*Id.*) The plan must be approved by TRPA and Placer County prior to HMR using any new snowmaking equipment. (*Id.* at 3878.) The EIR–EIS lists that measures in the plan may include, but are not limited to, setbacks, temporary barriers between the noise source and noise-sensitive land uses, selection of quieter snowmaking equipment, prohibiting or minimizing the operation of snowmaking activities during nighttime hours, reducing the amount of snowmaking equipment operating concurrently, and reducing the number of nozzles near noise sensitive land uses. (*Id.* at 3428–29.) Acoustical studies are required at the time specific designs are submitted to ensure compliance with the CNEL limits. (*See id.* at 3964.) The EIR–EIS finds that after mitigation, the snowmaking system's noise would meet the adjacent PAS CNEL limits. (*Id.* at 3429.)

The parties do not dispute that the potential environmental effects of expanded snowmaking had to be analyzed in the EIR–EIS because that expansion is a reasonable future phase of the Project. Plaintiffs argue that the EIR–EIS failed to adequately analyze the expanded snowmaking's noise effects by improperly deferring their consideration, while defendants contend that the level of analysis conducted was sufficient for a program-level EIR. Defendants also rely on their claim that further environmental review is required before the snowmaking expansion is approved, which would address any insufficiencies in the EIR–EIS's analysis of the expansion's noise effects.

Plaintiffs depend largely on *Stanislaus Natural Heritage Project v. County of Stanislaus*, 48 Cal.App.4th 182, 55 Cal. Rptr.2d 625 (5th Dist.1996), to argue that defendants' improperly deferred analysis of the snowmaking expansion's noise effects. The EIR under review in that case did not identify the significant impacts of supplying water beyond the first five years for a twenty-five year development project of an almost 30,000–acre destination resort and residential community. *Id.* at 188, 195, 55 Cal.Rptr.2d 625. The EIR concluded that until sources for the water are identified, the project's water requirements would be considered a significant

**49.** Plaintiffs note that defendants did in fact know how many snow guns are proposed to be included in the expanded snowmaking system. (*See* AR 3673 ("The proposed snowmaking system requires installation of ... 55 snow guns.").)

impact. *Id.* at 195, 55 Cal.Rptr.2d 625. The proposed mitigation measure for this significant impact was to forbid approval of development requiring over 1,200 acre-feet per year of water until adequate water supplies were made available and the environmental impacts of the sources were studied and mitigated per CEQA. *Id.* at 195, 55 Cal.Rptr.2d 625. The EIR also required additional environmental review of further water acquisition projects. *Id.* at 195, 55 Cal.Rptr.2d 625.

The EIR never identified, however, the specific environmental impacts of procuring the water. The court found the EIR's analysis insufficient under CEQA because the "environmental consequences of supplying water to th[e] project would appear to be one of the most fundamental and general 'general matters' to be addressed in a first-tier EIR." *Id.* at 199, 55 Cal. Rptr.2d 625 (quoting Cal. Pub. Res. Code § 21068.5). In other words, "[t]o defer any analysis whatsoever of the impacts of supplying water to this project until after the adoption of the specific plan calling for the project to be built would appear to be putting the cart before the horse." *Id.* at 200, 55 Cal.Rptr.2d 625.

The court agrees with plaintiffs that snow is to a ski resort as water is to a resort and housing development; that is, essential. But counsel for JMA repeatedly emphasized at oral argument that it was prepared to proceed with the Project whether or not the proposed snowmaking expansion is eventually approved by TRPA and the County. While snow is undoubtedly necessary to the Project's success, JMA asserts that even after the Project's expansion of Homewood, the mountain will have sufficient snow with what nature and its current snowmaking system provides to operate. It characterized the expanded system as "insurance" to ensure an adequate snowpack and well-maintained runs, rather than a necessity.

Had JMA depended on an extended ski season for the Project's economic feasibility, the expanded snowmaking system might be viewed as essential to the Project. The financial calculations prepared for the Project, however, do not rely on extending the ski season to ensure the Project's economic viability. Thus, while deferral was inappropriate in *Stanislaus* because the project could not function without water, it is not inappropriate here for that reason because the Project *can* go forward without expanded snowmaking. JMA's assertions on this point should alleviate plaintiffs' fear that approval of expanded snowmaking is inevitable because the Project might be infeasible without it.

Deferral was also not inappropriate here because TRPA and the County should be found to have already approved the expanded snowmaking system. CEQA permits agencies "to use 'tiering' to defer analysis of certain details of later phases of long-term or complex projects until those phases are up for approval." *Cal. Oak Found.,* 188 Cal.App.4th at 271, 115 Cal. Rptr.3d 631 (internal quotation marks and citation omitted). Contrary to plaintiffs' suggestions, while the Project (the ski area master plan) has been approved, the expanded snowmaking system has not received final approval. It is not included in the permits approved by TRPA and the County. (*See* TAR 2197–99; AR 8236.) The expansion *cannot* be built until JMA presents to TRPA and the County a noise control plan that will reduce the system's noise effects to within the appropriate PAS limits. (*Id.* at 3878.)

Nor was deferral inappropriate because a full analysis of the expanded snowmaking system's increased noise levels should be found to have been feasible. "A basic tenet of CEQA is that an environmental analysis 'should be prepared as early as feasible in the planning process to enable

environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment.' " *Laurel Heights,* 47 Cal.3d at 395, 253 Cal.Rptr. 426, 764 P.2d 278; *see* Guidelines § 15151 ("[T]he sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible."). "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR." *Id.* § 15146. The EIR–EIS's program-level analysis of the expanded snowmaking system's noise effects meets these standards.

The preliminary designs for the snowmaking expansion provide some important details, such as proposing locations for features like pipeline and hydrants. (AR 35877.) As the EIR–EIS explains, however, final plans for the snowmaking system have not been engineered, and other important details such as the location and type of snow guns, as well as noise control measures, have not been finalized. (*See id.* at 35913.) Plaintiffs suggest that the snow guns would presumably have to be placed relatively close to the electrical outlets, which are to be located near the hydrants, whose location has been designated. (*See id.* at 32520 (explaining that an electrical outlet will be next to each hydrant to plug the snow guns into).)

As counsel for JMA explained at oral argument, however, determining the precise location of the snow guns is important because natural features have a significant impact on the noise produced by the snow guns. The other undetermined factors, such as the type of snow guns to be selected and noise control measures, also have significant impacts on the expanded snowmaking's noise levels. Given these uncertainties, the EIR–EIS conducted the level of analysis that was feasible by quantifying the noise of the current snowmaking sys-

tem and explaining when snowmaking would occur with the expanded system. (*See id.* at 3409–10); *cf. L.A. Unified Sch. Dist. v. City of Los Angeles,* 58 Cal. App.4th 1019, 1028, 68 Cal.Rptr.2d 367 (2d Dist.1997) (noting that an environmental impact issue should be considered when the "agency preparing the plan has 'sufficient reliable data to permit preparation of a meaningful and accurate report on the impact' of the factor in question" (quoting *Laurel Heights,* 47 Cal.3d at 396, 253 Cal. Rptr. 426, 764 P.2d 278)).

Instead of improper deferral, the EIR– EIS relies on proper tiering. Tiering is described by California courts as "used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases." *Vineyard Area Citizens for Responsible Growth, Inc.,* 40 Cal.4th at 431, 53 Cal.Rptr.3d 821, 150 P.3d 709. "For example, to evaluate or formulate mitigation for site specific effects such as aesthetics or parking ... may be impractical when an entire large project is first approved; under some circumstances analysis of such impacts might be deferred to a later tier EIR." *Id.* at 431, 53 Cal.Rptr.3d 821, 150 P.3d 709 (internal quotation marks and citation omitted). Here, defendants found that the proposed expanded snowmaking system's noise effects would be significant and preceded to identify a mitigation measure that would reduce the effect to a less than significant level. Given the uncertainties about the expanded snowmaking system and the lack of final engineered plans, the EIR–EIS is not inadequate for not going a step further at the program-level of analysis to conduct a full study or make estimates of the increased noise levels the system will produce.

Plaintiffs next contend that there is no guarantee that additional environmental review of the snowmaking expansion's noise impacts will actually occur. The County's conditional use permit for the Project states that the snowmaking system will "require subsequent environmental review prior to development." (AR 8236.) Plaintiffs note, however, that while the EIR–EIS clearly makes a commitment to further analyze the water impacts of the expanded snowmaking system, which must be considered in conjunction with the Project's water needs a whole, it fails to do so for its noise impacts. The EIR–EIS requires JMA to provide "a detailed Water System Engineering Report ... [that shall] describe the necessary infrastructure required by the serving water provider to meet the Proposed Project's domestic, fire protection, and snow making water demands." (*Id.* at 3985.) It must produce this plan "prior to approval of Improvement Plans for any portion of the HMR MP Phase 1 development." (*Id.*) Furthermore, the hydrology section of the EIR–EIS states that "[s]nowmaking is proposed as a programmatic-level project component and will require further environmental review prior to project conditioning and/or approvals." (*Id.* at 3643.)

Although there is no comparable commitment to further environmental analysis of the snowmaking system's noise effects in the EIR–EIS, CEQA requires such review. Regarding subsequent environmental review when an agency relies on tiering, the Guidelines provide that "[i]f a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration." Guidelines § 15168(c)(1). Because the Project used a tiered EIR–EIS, it is subject to this provision and must provide additional environmental review if any of the snowmaking system's effects have not been adequately studied. Defendants also

emphasize that further environmental review will occur because the mitigation measure for snowmaking's noise effects requires TRPA and the County to approve JMA's noise control plan before the snowmaking expansion can be constructed. (AR 3428.)

Plaintiffs last press that without quantifying the snowmaking expansion's expected increase in noise levels, there is no basis for the EIR–EIS's conclusion that the Project's snowmaking noise impacts will be reduced to meet the PAS noise limits. They argue that this is especially so because the Homewood resort already violates those limits. (*See id.* at 3397.) In *Laurel Heights*, a neighborhood association challenged the finding of mitigation for a building's noise impacts when the major source of the noise—ventilation fans—had not been studied or quantified. 47 Cal.3d at 418, 253 Cal.Rptr. 426, 764 P.2d 278. The EIR explained that:

> The noise from these fans can be calculated once the systems are designed and the fans selected. Specific noise control treatments including fan silencers, barrier walls, or baffled enclosures will then be evaluated if predicted levels exceed the performance standards. The equipment design will be reviewed by a qualified acoustical engineer for compliance with the noise performance standards.

*Id.* (internal quotation marks omitted). The *Laurel Heights* court found this analysis of mitigation to be sufficient, despite the EIR's failure to quantify the probable noise the fans would produce and the not yet finalized mitigation plan intended to ensure that the fans' noise would be reduced to a less than significant level. *See id.*

The present case is very similar to *Laurel Heights*. Although the snow guns for the expanded system have not yet been selected and their noise levels at different

locations around the Resort once installed not yet quantified, JMA must present a noise control plan that shows the expanded snowmaking system's noise levels are in compliance with the PAS limits before the County and TRPA can approve the system.[50] (AR 3428, 3878.) Acoustical studies are also required at the time final designs are submitted to ensure compliance. (*Id.* at 3964.) As did the court in *Laurel Heights*, the court likewise determines here that the EIR–EIS adequately shows that the mitigation measure will reduce the expanded snowmaking's noise impacts to a less than significant level. And although "a mitigation measure cannot be used as a device to avoid disclosing project impacts," the EIR–EIS made no such ploy. *San Joaquin Raptor Rescue Ctr.*, 149 Cal. App.4th at 663–64, 57 Cal.Rptr.3d 663. It identifies the expanded snowmaking system's noise impacts as significant and, by relying on tiering, commits to further environmental review of the expansion. The fact that the mitigation measure for snowmaking's noise impacts is intended to reduce those impacts to a less than significant does not diminish those other factors.

In sum, the EIR–EIS did not improperly defer analysis of the snowmaking expansion's noise impacts. Its program-level analysis provided " 'detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " *Dry Creek Citizens Coal. v. County of Tulare*, 70 Cal.App.4th 20, 26, 82 Cal.Rptr.2d 398 (1999) (quoting *Laurel Heights*, 47 Cal.3d at 405, 253 Cal.Rptr.

426, 764 P.2d 278). Thus, the EIR–EIS's analysis of the expanded snowmaking system neither violated CEQA, nor precluded the County's finding that the mitigation measure will effectively reduce the expanded snowmaking system's noise effects to a less than significant level.

### 2. *Compact*

Again assuming that the Compact requires the EIR–EIS to take a "hard look" at the Project's snowmaking noise impacts, the EIR–EIS's analysis is sufficient under the Compact for the same reasons the court finds it to be sufficient under CEQA. Additionally, TRPA's finding that the Project's increased snowmaking noise will be mitigated to a less than significant level in reliance on the EIR–EIS's analysis did not violate the Compact for the same reasons the Compact's comparable finding did not violate CEQA.

### C. *Validity of TRPA's Noise Threshold Findings*

Whenever TRPA amends the Regional Plan, it must find "that the Regional Plan, as amended, achieves and maintains the thresholds." Code § 6.4. Likewise, when it amends the Code, it must find that that "the Regional Plan, and all of its elements, as implemented through the Code, Rules, and other TRPA plans and programs, as amended, achieves and maintains the thresholds." Code § 6.5. The Project area and surrounding areas are currently not in attainment with the local PAS CNEL limits due to traffic and snowmaking noise.

---

**50.** The mitigation measure is not defective because JMA will work from a non-exclusive list of measures to devise a noise control plan subject to TRPA's and the County's approval. "[F]or [the] kinds of impacts for which mitigation is known to be feasible, the EIR may give the lead agency a choice of which measure to adopt, so long as the measures are coupled with specific and mandatory performance standards to ensure that the measures, as implemented, will be effective." *CBE*, 184 Cal.App.4th at 94, 108 Cal.Rptr.3d 478. The snowmaking expansion's noise levels must comply with the PAS limitations. And, here, an even stronger medicine exists than in the usual case: the mitigation measure *must* prove to be effective or the expansion will not be approved.

(TAR 732.) Noise from traffic and snowmaking is expected to increase under the Project. (*Id.*) Despite this, TRPA found that the Project will assist TRPA in attaining the noise thresholds. It explained that "Mitigation Measure NOI–2 would reduce traffic noise relative to existing and future no-project conditions, and Mitigation Measures NOI–3a and NOI–3c would reduce snowmaking noise to PAS CNEL levels." (*Id.* at 732–33.)

 There is substantial evidence in the record to support TRPA's finding that the amendments to the Plan and Code will achieve and maintain the noise threshold. The court found that TRPA adequately studied the noise impacts due to the Project's construction and the proposed snowmaking expansion, and that TRPA properly concluded that the adjacent PAS standards will be met by Homewood because the mitigation measure for expanded snowmaking requires as much. Moreover, even if expanded snowmaking is not approved, Mitigation Measure NOI–3c still applies. It provides that "HMR must reduce noise levels to meet adjacent PAS CNEL limits. The reduction of noise to PAS CNEL levels shall be re-evaluated annually to ensure that HMR is implementing all possible snowmaking measures available to work towards the attainment of the PAS CNEL noise standards . . . ." (AR 3878.)

Even if plaintiffs have not exhausted their argument that the Project's daytime construction noise would violate CNEL standards, thereby precluding TRPA from finding that the amendments required for the Project achieve and maintain the noise thresholds, the court finds that it has no merit. Although construction noise will temporarily result in violations of the noise thresholds for the Project area, TRPA has found that the Project, when completed, will assist with achieving the noise thresholds because it will reduce noise relative to current conditions. Thus, substantial evidence supports TRPA's conclusion that the amendments to the Regional Plan and Code achieve and maintain the noise thresholds.

VIII. *Conclusion*

With respect to the EIR–EIS's analysis of Alternative 6 and to TRPA's and the County's findings that Alternative 6 is economically infeasible, plaintiffs' motion for summary judgment is GRANTED as to all defendants, and defendants' cross-motions for summary judgment are DENIED. In all other respects, defendants' cross-motions for summary judgment are GRANTED and plaintiffs' motion for summary judgment is DENIED. This does not necessarily mean that the Project or some version of it may not go forward at some point in time. However, before it does, TRPA and the County must ensure that a legally adequate EIR–EIS has been certified and the necessary findings under CEQA and Compact have been made.

IT IS THEREFORE ORDERED that TRPA and the County shall not begin any construction of the Project without the preparation, circulation, and consideration under CEQA and the Compact of a legally adequate EIR–EIS with regard to Alternative 6 and adoption of the appropriate findings required by CEQA and the Compact.

The clerk shall administratively close this file, which may be re-opened upon the application of any party upon a showing of good cause.

*MEMORANDUM AND ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT RE: CROSS MOTIONS FOR SUMMARY JUDGMENT*

Before the court is Tahoe Regional Planning Agency ("TRPA"), the County of

Placer (the "County"), Homewood Village Resorts, and JMA Ventures' (collectively, "defendants") motion to alter or amend the judgment of the January 4, 2013, Memorandum and Order Re: Cross Motions for Summary Judgment ("Order"), (Docket No. 69), pursuant to Federal Rule of Civil Procedure 59(e). (Docket No. 71.) The Order granted in part and denied in part cross motions for summary judgment. (Order at 113–14.) Plaintiffs Sierra Club and Friends of the West (together, "plaintiffs") oppose the motion.[1]

Reconsideration is an "extraordinary remedy" which should be used "sparingly in the interests of finality and the conservation of judicial resources." *Kona Enter., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir.2000); *see also Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (stating that reconsideration should only be granted in "highly unusual circumstances"). A motion for reconsideration "should not merely present arguments previously raised, or which could have been raised in the initial ... motion." *United States v. Westlands Water Dist.*, 134 F.Supp.2d 1111, 1130 (E.D.Cal.2001) (citing *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir.1985)). It has been said that under Rule 59(e), "[r]econsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J*, 5 F.3d at 1263.

Defendants argue that the court committed legal error by requiring revision of the EIR–EIS after finding that the EIR–EIS's analysis of Alternative 6 was inadequate and that substantial evidence did not support the County and TRPA's respective findings that Alternative 6 was economically infeasible. Defendants point to the directive in California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code § 21000–21176, case law that when the feasibility of an alternative depends on economic factors, the evidentiary basis for the agency's finding that the alternative is economically infeasible need not be in the EIR itself, but must be in the administrative record. *See, e.g., Flanders Found. v. City of Carmel–by–the–Sea*, 202 Cal. App.4th 603, 618, 135 Cal.Rptr.3d 221 (6th Dist.2012). The court acknowledged this requirement in its Order, explaining that "CEQA does 'not require the EIR itself to provide any evidence of the feasibility of ... alternatives, much less an economic or cost analysis of the various project alternatives and mitigating measures identified by the EIR." (Order at 55 (quoting *San Franciscans Upholding the Downtown Plan v. City & Cnty. of S.F.*, 102 Cal.App.4th 656, 690–91, 125 Cal.Rptr.2d 745 (1st Dist. 2002)).) The court cannot agree with defendants, however, that in requiring the preparation of a legally adequate EIR–EIS it committed clear error or that the remedy it ordered is manifestly unjust.

The "Guidelines," which flesh out CEQA's provisions, prescribe that an EIR "include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project."[2] Cal. Code Regs., tit. 14, § 15126.6, subd.(d). An EIR–EIS must have " 'detail sufficient to enable those who did not participate in its preparation to

---

1. The detailed factual background of this case may be found in the Order. *See* (Docket No. 69); *Sierra Club v. Tahoe Reg'l Planning Agency*, 916 F.Supp.2d 1098, 2013 WL 79947 (E.D.Cal.2013).

2. The Guidelines are set forth in the California Code of Regulations, title 14, section 15000 *et seq.*

understand and to consider meaningfully the issues raised by the proposed project.'"[3] *Pres. Action Council v. City of San Jose*, 141 Cal.App.4th 1336, 1355, 46 Cal.Rptr.3d 902 (6th Dist.2006) (quoting *Laurel Heights Improvement Ass'n v. Regents of Univ. of Cal.*, 47 Cal.3d 376, 405, 253 Cal.Rptr. 426, 764 P.2d 278 (1988)). Further, "the agency preparing the EIR may not simply accept the project proponent's assertions about an alternative; the agency must *'independently* participate, review, analyze and discuss the alternatives in good faith.'" *Save Round Valley Alliance v. County of Inyo*, 157 Cal. App.4th 1437, 1460, 70 Cal.Rptr.3d 59 (4th Dist.2007) (quoting *Kings Cnty. Farm Bureau v. City of Hanford*, 221 Cal.App.3d 692, 708, 270 Cal.Rptr. 650 (5th Dist.1990)).

At the outset of the Order's analysis of the EIR–EIS's alternatives discussion, the court explained that one of the project's objectives was to generate sufficient revenue to support the project's proposed environmental and fire safety improvements, as well as the economic viability of the ski operations. (Order at 30.) As noted in the Order, the EIR–EIS, based on information provided by the project proponent, rejected that Alternative 6 could meet that objective of economic feasibility.[4] (Order

at 56–57; *see also* Administrative Record 3923 ("Alternatives consisting of fewer than the 282 units included in Alternative 6 would *likewise* be financially infeasible ....") (emphasis added).)

In *Preservation Action Council v. City of San Jose*, the court ruled that the EIR's analysis of a reduced-size alternative was inadequate because ambiguity regarding the size of the alternative "would have made it difficult to compare the size of the ... alternative to the size of other home improvement warehouses in the area in order to evaluate the validity of the claim by [the project proponent] that the ... alternative was infeasible because it would produce a 'competitive disadvantage.'" *Pres. Action Council*, 141 Cal.App.4th at 1355, 46 Cal.Rptr.3d 902. In other words, the EIR made it impossible to determine whether the alternative would achieve the project applicant's objectives.

The ambiguity in that case "meant that the public and the City Council were not properly informed of the requisite facts that would permit them to evaluate the feasibility of th[e] alternative," *id.*, and that the EIR "lacked 'detail sufficient to enable those who did not participate in its preparation to understand and to consider

---

**3.** Defendants are correct that the quotation from *Laurel Heights* cited in the Order's discussion of the sufficiency of the EIR–EIS's analysis of Alternative 6 arose in the context of an EIR's failure to adequately explain why it had declined to further analyze certain alternatives. But, at the same time, the *Laurel Heights* court was also disapproving the minimal attention the EIR gave to the "no project" alternative. *Laurel Heights Improvement Ass'n*, 47 Cal.3d at 403, 253 Cal.Rptr. 426, 764 P.2d 278. It therefore had occasion to explain the importance of meaningful analysis of alternatives that *are* considered in an EIR in equivalent terms to those stated in the Order: "An EIR's discussion of alternatives must contain analysis sufficient to allow informed decision making.... Without meaningful analysis of alternatives in the EIR, nei-

ther the courts nor the public can fulfill their proper roles in the CEQA process." *Id.* at 404, 253 Cal.Rptr. 426, 764 P.2d 278. The court went on to say, "An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." *Id.* at 405, 253 Cal.Rptr. 426, 764 P.2d 278.

**4.** Obviously the court did not intend to suggest that the EIR–EIS rejected analyzing Alternative 6 wholesale. Indeed, the court rejected plaintiffs' contention that the EIR–EIS needed to analyze a further reduced-size alternative on the grounds that analyzing one reduced alternative—Alternative 6—was sufficient.

meaningfully' the reduced-size alternative," *id.* (quoting *Laurel Heights Improvement Ass'n,* 47 Cal.3d at 404–05, 253 Cal.Rptr. 426, 764 P.2d 278).

After explaining that the City also did not include meaningful detail in the record regarding the project proponent's claim that the reduced-size alternative was infeasible or make a specific finding validating that claim, the court in that case held that "[t]he City violated CEQA by failing to ensure that the [EIR] adequately analyzed the potentially feasible and environmentally superior reduced-size alternative and failing to make a specific finding, based on substantial evidence, regarding the feasibility of the reduced-size alternative." *Id.* at 1357, 46 Cal.Rptr.3d 902. The court therefore required revision of the EIR to remedy its inadequate analysis of the reduced-size alternative. *Id.* at 1357–58, 46 Cal.Rptr.3d 902 (also requiring adoption of appropriate findings based on substantial evidence).

In the instant case, this court likewise ordered revision of the EIR–EIS after making comparable rulings regarding the EIR–EIS's analysis of Alternative 6's economic feasibility and the County and TRPA's respective findings that Alternative 6 is economically infeasible.[5] Not to have ordered revision of the EIR–EIS would have ignored the distinction between the feasibility determinations the County and TRPA are entitled to make on the record and the analysis of a project's alternatives that CEQA requires to be in the EIR–EIS. To properly compare alternatives, information on how each alternative meets or fails to meet the project's objectives must be adequate and accurate. Because the project's economic feasibility is one of its key objectives, simply redoing findings will not cure the defect in the

EIR–EIS identified by the court in its Order and ensure that the EIR–EIS is the public informational document and guide for the agencies it is intended to be. Accordingly, the court neither committed clear error nor ordered a manifestly unjust remedy.

IT IS THEREFORE ORDERED that defendants' motion to alter or amend the judgment be, and the same hereby is, DENIED.

---

5. The court found in its Order that the Tahoe Regional Planning Compact, Pub. L. No. 96–551, 94 Stat. 3233 (1980); Cal. Gov't Code § 66801 *et seq.;* Nev.Rev.Stat. § 277.200 *et seq.,* requires a comparable analysis of alternatives to CEQA. (Order at 57.)